THE STATE OF OHIO, APPELLEE, *v*. HAND, APPELLANT.

[Cite as *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18.]

(No. 2003–1325—Submitted July 26, 2005—Decided January 18, 2006.)

———————

LUNDBERG STRATTON, J.

{¶ 1} In this appeal, defendant-appellant, Gerald R. Hand, raises 13 propositions of law. We find that none of his propositions of law have merit and affirm Hand's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors as to each count and have compared Hand's sentence of death to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm Hand's sentence of death.

{¶ 2} On March 24, 1976, Hand notified police that he found the strangled body of his wife, 28–year–old Donna Hand, in the basement of their Columbus home.

On September 9, 1979, while Hand was out of town, family members found the strangled body of Hand's second wife, 21-year-old Lori Hand, in the basement of the same home. The murders of Donna and Lori Hand remained unsolved for more than 20 years.

{¶ 3} Sometime before January 15, 2002, Hand hired Walter "Lonnie" Welch, a longtime friend, to kill his wife, 58-year-old Jill Hand. On the evening of January 15, Hand shot and killed Jill at their Delaware County home and then shot and killed Welch when he arrived there. Subsequent investigation showed that Hand had previously hired Welch to kill Donna and Lori Hand.

{¶ 4} Hand was convicted of the aggravated murders of Jill and Welch and sentenced to death. The evidence established that Hand's marriage to Jill had soured, Hand had accumulated more than $200,000 in credit card debt, and Hand stood to collect more than $1,000,000 in life insurance and other benefits on Jill's death. Before his death, Welch had told various friends and family members that Hand hired him to kill Jill and that Hand had previously hired him to kill Donna and Lori. Hand admitted that he had shot Welch, and forensic evidence established that Hand's claim that he acted in self-defense on the night of the murders was unsupported by the evidence. Forensic evidence established that Welch was shot in the back at close range. Hand also admitted to a cellmate that he had shot Jill and Welch.

### State's Case

{¶ 5} **Murder of Donna Hand.** On the evening of March 24, 1976, Hand notified police that his wife had been murdered at their home on South Eureka Avenue in the Hilltop section of Columbus. According to Hand, he returned home after being out with his brother but was unable to open his front door because it was double latched from the inside. Hand entered the house through a side door and found Donna's body.

{¶ 6} The police found Donna's fully clothed body at the bottom of the basement stairway. She had a bag over her head and it was tied with a spark-plug wire. The police found no sign of forced entry. Drawers in the upstairs bedroom had been removed and turned over, but the room did not appear to have been ransacked. Moreover, no property was missing from the house.

{¶ 7} Dr. Robert Zipf, then a Franklin County Deputy Coroner, examined Donna's body at the scene and found blood around the head where the body was lying. However, no blood spatters or other bloodstains were found on the stairs, which indicated that Donna had not hit her head falling down the steps.

{¶ 8} During the autopsy, Dr. Zipf found "three chop wounds to the back of [Donna's] head" that were caused by "some type of blunt object, maybe a very

thin pipe or a dull hatchet." However, Dr. Zipf determined that Donna had died from strangulation caused by the spark-plug wire around her neck.

{¶ 9} During the fall of 1975, Donna told Connie Debord, her sister, that she planned to divorce Hand and move back to their parents' home. Donna felt that "everything was over" and "feared for her life." About two weeks before she was killed, Donna told Evelyn Latimer, another sister, that she was going to file for divorce.

{¶ 10} Hand received $67,386 in life insurance following Donna's death. Hand also filed a claim for reparations after Donna's death and received $50,000 from the Ohio Victims of Crime Compensation Division of the Court of Claims.

{¶ 11} During 1975 or 1976, Teresa Fountain overheard Welch talking to Isaac Bell, Fountain's boyfriend, about "knocking his boss's wife off to get some insurance money." Sometime after Donna's murder, Welch told Fountain, "I hope you didn't hear anything and * * * you keep your mouth shut, * * * you didn't hear anything."

{¶ 12} **Murder of Lori Hand.** Hand married Lori Willis on June 18, 1977, and Welch was the best man at the wedding. Hand and Lori lived in the home on South Eureka Avenue in which Donna had been murdered.

{¶ 13} By June 1979, Hand's marriage to Lori was falling apart. Lori told her friend, Teresa Sizemore, that she was unhappy with her marriage and was making plans to file for a divorce. Sizemore also saw Lori and Hand interact, but she "didn't see any warmth there because [Lori] wasn't happy."

{¶ 14} Around 8:30 a.m. on September 9, 1979, Hand and his baby, Robby, left home so that Lori could clean the house for a bridal shower planned for that afternoon. Steven Willis, Lori's brother, picked up Hand at his house. The three of them then spent the next few hours visiting a flea market, a car show, and Old Man's Cave in Hocking Hills. They also went go-cart racing.

{¶ 15} Around 9:30 a.m., Lois Willis, Lori's mother, arrived at Hand's home to help Lori prepare for the bridal shower. After Lois knocked and did not get an answer, she left and returned about an hour and half later. Upon returning, Lois noticed that the front door was ajar and entered the house. Alarmed, she called Hand's family, who found Lori's body in the basement.

{¶ 16} Police discovered Lori's body on the basement floor with a plastic sheet wrapped around her head. Lori's pants were unfastened with the zipper down, and her blouse was pulled up against her breast line. Bloodstains and blood spatters were found on the wall near Lori's body, and a spent lead projectile was found near her body. Lori had been shot twice in the head, but neither gunshot killed her. Dr. Patrick Fardal, a Franklin County Deputy Coroner, determined that strangulation was the cause of death.

{¶ 17} Lori's vehicle had been stolen from Hand's garage. Police recovered her vehicle about three blocks from the Hand home.

{¶ 18} Police found the first and second floor levels of the house in disarray, with drawers and other items of property dumped on the floor. Nevertheless, the house did not appear to have been burglarized, because there were no signs of forced entry and the rooms were only partially ransacked. Investigators also seized a cash box containing credit card slips, currency, and a .38 caliber handgun from the trunk of Hand's car parked in the garage.

{¶ 19} After he learned of Lori's death, Hand returned home. Hand told police that he had been out of the house with Steve and his young son when Lori was murdered. Hand said that "everyone, including * * * his brothers and help at the shop would have known" that he was going to be gone from the house that morning.

{¶ 20} Hand told police that he was very possessive of Lori. He admitted having sexual problems with Lori because he "wanted sex at least once a night and she didn't want to do that." When asked about insurance, Hand said that he had in the past year doubled its value and that it should pay off both of his mortgages. Hand received $126,687.90 from five separate life insurance policies after Lori's death.

{¶ 21} On September 10, 1979, the police recovered a pair of gloves near where Lori's vehicle was found. The fingers of the gloves were bloody, and the gloves had been turned inside out. Human bloodstains were found on the gloves, and debris from inside the gloves was preserved.

{¶ 22} On October 9, 1979, the police reinterviewed Hand. Hand provided the names of Welch and others who worked for him and said that he did not trust any of them. He told police that everyone, including all of his neighbors, was aware that he had received $50,000 after his first wife's murder. Hand also said that his wife was not planning to separate from or divorce him and that they were "extremely in love with each other."

{¶ 23} During the fall of 1979, Welch went to the home of Pete Adams, Welch's first cousin, and told Adams that he had "killed Donna and Lori Hand" and had done it for Bob Hand. Adams did not notify police about this conversation until after Welch's death in 2002.

{¶ 24} During 1979 and 1980, Betty Evans, Welch's sister, observed that Welch had a "wad of money," cars, and a girlfriend who wore a mink jacket, a diamond necklace, and rings. Around the same time, Welch told Evans that if she "knew anything, not to say anything because him and Bob had a pact and if anything got out, they were going to kill each other's mother."

{¶ 25} In the 1980s and 1990s, Welch intermittently worked as a mechanic at Hand's radiator shop in Columbus. Hand also provided Welch with extra money on a frequent basis and gave him cars and a washer and dryer. In the late 1980s, Welch started using crack cocaine and spent a lot of money on it.

{¶ 26} Sometime after Lori's death, Hand met and married Glenna Castle. They were married for seven to eight years and then divorced.

{¶ 27} **Hand's marriage to Jill and his financial problems.** In October 1992, Hand married Jill Randolph, a widow, and moved into Jill's home on Walnut Avenue in Galena, Delaware County. Jill was employed at the Bureau of Motor Vehicles in Columbus and was financially secure. Hand was the beneficiary of Jill's state retirement and deferred-compensation accounts in the event of her death, and he was the primary beneficiary under her will.

{¶ 28} By 2000, Hand's radiator shop had failed, and he was deeply in debt. During the 1990s and early 2000, Hand obtained thousands of dollars by making credit card charges payable to Hand's Hilltop Radiator. By January 2002, Hand had amassed more than $218,000 in credit card debt.

{¶ 29} At some point, Jill found out about the extent of Hand's debt. During 2000, she learned that Hand had charged more than $24,000 on a credit card in her name. Jill was upset and told her daughter, Lori Gonzalez, that "[s]he was going to have Bob pay off that amount that he had charged up with the sale from his business."

{¶ 30} In October 2000, Hand sold his radiator shop and the adjoining buildings. In May 2001, Hand started working as a security guard in Columbus and earned $9.50 an hour. Despite his enormous debt, Hand continued to pay on several credit cards to maintain life insurance coverage on his wife, including payments in December 2001 and January 2002.

{¶ 31} Hand and Jill grew increasingly unhappy with one another. During 2001, Hand told William Bowe, a friend of Hand's, that he was "quite tired of her." Abel Gonzalez, Jill's son-in-law, lived at the Hand home from April to June 2001. Abel said that Hand and Jill's marriage was "on the down slope. * * * There was no warmth there. * * * It seemed everything Bob would do would antagonize Jill, and she made it real clear that she was upset."

{¶ 32} **Plans to murder Jill Hand.** In July or August 2001, Welch asked Shannon Welch, his older brother, if he had a pistol or could get one. Welch also asked, "Do you know what I do for extra money?" He continued, "Well, I killed Bob's first wife and * * * I got to kill the present wife and I'll have a lot of money after that." Welch said he was going to be well off enough to retire and talked about buying an apartment complex. Thereafter, Welch asked Shannon about a pistol "maybe once a week, sometimes twice a week."

{¶ 33} Between December 21, 2001, and January 3, 2002, Welch was in jail for various motor vehicle violations. During that time, Welch told his cellmate, David Jordan Jr., that he planned to "take somebody out for this guy named Bob" and mentioned that he had "put in work for him before." Welch said he needed a driver because his eyes were "messed up." He asked Jordan if he wanted the job and offered to pay him between $5,000 and $6,000. Welch said this job was supposed to happen in January, and he gave Jordan his phone number.

{¶ 34} During December 2001, Shannon asked Hand whether he could provide bond money to get Welch out of jail. Hand said, "Well, I can't have no contact with Lonnie * * * because we got business" and refused to give him any money.

{¶ 35} On January 14, 2002, Welch told Tezona McKinney, the daughter of Welch's common-law wife, that he was going to buy a car for her mother. Welch said he "was going to get the money the next day" and would buy the car "because [he] didn't buy her anything for Christmas because [he] was in jail."

{¶ 36} Around 5:00 p.m. on January 15, 2002, Welch attended a family gathering at Evans's home in Columbus to celebrate Evans's birthday. Welch told Shannon that he had to "be ready * * * to see Bob because [he] might be taking care of * * * business tonight." Before leaving, Welch told Evans that he "was going to pick up some money and he'd be right back."

{¶ 37} **Murder of Jill and Welch.** Around 6:45 p.m. on January 15, 2002, Hand arrived home from work. At 7:15 p.m., Hand made a 911 call to report that his wife had been shot by an intruder. Hand also reported that he had shot the intruder.

{¶ 38} Police found Welch's body lying face down on Hand's neighbor's driveway. Inside Hand's house, Jill's body was found lying between the living room and the kitchen. Hand told police that he had shot the intruder but did not know his identity. He also gave police two .38-caliber revolvers that he used to shoot him. On the way to the hospital, Hand saw the intruder's vehicle and told Mark Schlauder, a paramedic, that "it could have belonged to somebody that worked for" Hand.

{¶ 39} Around 8:00 p.m. on January 15, Detective Dan Otto of the Delaware County Sheriff's Office interviewed Hand at the hospital. Hand said that after arriving home, he had dinner with Jill and then went to the bathroom. Upon exiting, Hand heard Jill scream, "Gerald," heard two gunshots, and saw a man in a red and black flannel shirt at the end of the hallway. Hand then retrieved two .38 caliber revolvers from the master bedroom. Hand started down the hallway firing both guns at the intruder, but had trouble shooting because the guns were "misfiring" and "missing every other round." Hand followed the intruder out the

front door and continued firing at him as he ran toward his car, and then the intruder fell on the neighbor's driveway.

{¶ 40} During the interview, Hand repeated that he did not recognize the gunman, but recognized Welch's car in the driveway. Hand said he "didn't know [Welch] that well; that he did odd jobs around the shop; that he was a thief; that he was a cocaine addict; that he * * * [came] in to the shop area from time to time." Hand also said that it had been a year since he had had any contact with Welch, and Welch had no reason to be at his home that night.

{¶ 41} Investigators found no sign of forced entry at Hand's residence. Blood spatters were found inside the front door and on the front-door stoop. The top of the storm door was shattered, and particles of glass extended 13 feet into the front yard. All the glass fragments were found on top of the blood spatters. Police also found a black jacket on the front stoop, a spent bullet and glass fragments on top of the jacket, and a tooth outside the front door.

{¶ 42} According to Agent Gary Wilgus, a crime-scene investigator, the blood spatters indicated that the victim was bleeding and "blood was dropping from his body" as he was moving away from the house. A bloody trail led onto the sidewalk and through the front yard and ended where Welch was lying in the driveway. Welch was wearing cloth gloves, and a knit hat with two eyeholes and a mouth hole was next to his head. Police also found a .32-caliber revolver on the front lawn.

{¶ 43} Inside the house, police found glass fragments and bloodstains extending two to three feet from the front door and another tooth just inside the front door. Jill's body was 12 feet from the front door, her legs pointed towards the front door, and she was wearing a nightgown. Jill had been shot in the middle of her forehead. A second bullet deflected off the floor and was found on the carpet next to Jill's head.

{¶ 44} Investigators found a bullet in the living room ceiling, and a second bullet was found in the living room window frame. While investigators could not determine the exact trajectory of the two bullets, they determined that they most likely originated from gunshots in the hallway area. No evidence of gunplay was found elsewhere in the house.

{¶ 45} On January 17, 2002, Detective Otto reinterviewed Hand, and Hand provided a different version of events. Hand stated that after his wife was shot, he retrieved two guns from the master bedroom, went into the hallway, and saw Welch "coming down the hallway towards the master bedroom at him." Hand and Welch then began firing at each other in the hallway and were within four feet of each other during the gun battle. Hand repeated that he chased Welch outside the house but "couldn't get his guns to fire; that he was missing every

other round and * * * they weren't firing." When asked about the .32-caliber revolver in the front yard, Hand stated that he did not know who owned it.

{¶ 46} During the second interview, Hand said, "I was misquoted on the first interview at the hospital" about not knowing Welch. Hand said that he had known Welch, a former employee, for over 20 years. However, Hand continued to give the impression that they were not close. When asked about a wedding photo showing Welch as his best man, Hand said he "couldn't find anybody else to stand in as [his] best man." Hand repeated that "the only thing he saw" on the night of the murder was an unknown person in "red and black flannel," and he had "no clue who this unknown person was." Hand also said that "Jill had never met Lonnie; Lonnie's never been to Walnut Avenue; he had no idea why he was there."

{¶ 47} In discussing his financial situation, Hand said he sold his radiator shop in October 2000 and received $300,000, and later received $33,000 from the sale of his share of the business and its inventory, and $140,000 from somewhere else. Hand said he "always needed money, but if he needed money, he could get some; that he had money." Hand also told police that he was "hiding the money and that he was considering filing bankruptcy; that that was against Jill's wishes." Later, Hand said that he "wasn't going to file for the bankruptcy * * * and they were going to work it out." When asked if he had any offices, Hand said that his office was in a bedroom in the house. However, Hand failed to disclose that he kept business records at another location.

{¶ 48} On January 19, 2002, the police seized several boxes containing Hand's business and personal records from the storage area above a hardware store near Hand's former radiator shop. These records included credit cards, credit-card- and life-insurance-account information, payment receipts, a list of credit card debt prepared by Jill, and other information about Hand's finances.

{¶ 49} Heather Zollman, a firearms expert, testified that the .32-caliber revolver found in the front yard was loaded with two fired and three unfired .32-caliber Smith and Wesson ("S & W") Remington–Peters cartridges. Bullet fragments removed from Jill's skull were consistent with being an S & W .32-caliber bullet. In testing the .32-caliber revolver, Zollman found that "on more than 50 percent of [her] testing, the firearm misfired" as a result of "a malfunction of the firearm." The stippling pattern shown in Jill's autopsy photographs indicated that "the muzzle to target distance was greater than six inches, and less than two feet."

{¶ 50} Zollman tested the two .38-caliber revolvers and found that they were both in proper working order, and neither weapon showed any tendency to misfire. A bullet removed from Welch's right forearm was "consistent with the .38 caliber." Zollman also concluded that the bullet and fragments recovered

from Welch's mouth and his lower back had rifling class characteristics corresponding with the S & W .38-caliber revolver. Further, gunshot residue around the bullet hole on the back of Welch's shirt revealed a muzzle-to-target distance greater than two feet from the garment but less than five feet.

{¶ 51} Jennifer Duvall, a DNA expert, conducted DNA testing of bloodstains found on the shirt Hand was wearing on the night of the murders. Five of the bloodstains were consistent with the DNA profile of Welch. The odds that DNA from the shirt was from someone other than Welch was "one in more than seventy-nine trillion in the Caucasian population; one in more than forty-four trillion in the African–American population, and one in approximately forty-three trillion in the Hispanic population."

{¶ 52} Michele Yezzo, a forensic scientist, examined bloodstain patterns on Hand's shirt. There were more than 75 blood spatters of varying sizes on the shirt. Yezzo concluded that the shirt was "exposed to an impact" that "primarily registered on the front of the garment." Yezzo also examined glass fragments collected from Hand's residence and "found tiny fragments of clear glass" on Hand's shirt, trousers, tee-shirt, and pair of socks that he was wearing on the night of the murders. However, she found no glass fragments on Welch's boots. Yezzo conducted a fiber analysis of the bullet from Welch's mouth, but found "no fibers suitable for comparison."

{¶ 53} Ted Manasian, a forensic scientist, found particles of lead and barium on both gloves that Welch was wearing, and these are "highly indicative of gunshot residue." Manasian could not determine how the gunshot residue got on the glove, just that it was there. Thus, Welch could have fired the gun, or was in the proximity of the gun when it was discharged, or handled an item that had gunshot residue on it.

{¶ 54} Detective Otto testified that $1,006,645.27 in life insurance and state-benefit accounts were in effect at the time of Jill's death. This amount included $113,700 in Jill's Ohio Public Employees Retirement System account and $42,345.29 accumulated in the Ohio Public Employees Deferred Compensation program.

{¶ 55} Dr. Keith Norton, a forensic pathologist in the Franklin County Coroner's office, conducted the autopsy of Jill and Welch. He concluded that Jill died from a single gunshot wound to the head. Dr. Norton found that Welch had been shot five times: in his mouth, left upper chest, left forearm, right shoulder, and lower back. The gunshot wound to Welch's lower back went into the spinal cord and would have paralyzed his legs. However, the gunshot wound to the chest was the cause of death.

{¶ 56} According to Kenneth Grimes Jr., Hand's former cellmate in the Delaware County Jail, Hand told him that he "killed his wife and the man he was

involved with." Hand said he hired a man and they had "been doing business together for years." Hand said he "hired the man to kill his wife and, in turn, the deal went sour. He wanted more money, so he killed two birds with one stone. He got both and didn't have to pay anything." Hand said he had agreed to pay $25,000 to have his wife killed, and the man "wanted it doubled." Hand said he was going to claim self-defense. He also said the evidence against him was "circumstantial and there were many witnesses that didn't have * * * any actual, proof."

{¶ 57} **Attempted jail escape.** Hand was incarcerated in the Delaware County jail beginning on August 8, 2002. On November 26, 2002, correction officers discovered an escape attempt in Hand's cell block.

{¶ 58} An attempt had been made to cut through the lock on the rear emergency exit of the cell block and through a cell bar. Officers searching Michael Beverly's cell found two saw blades. Police also seized some torn-up tee-shirt material and a pencil with a tee-shirt tied around it from Hand's belongings in his neighboring cell.

{¶ 59} Michael Beverly and Wedderspoon, another inmate, came up with the idea for the escape. Beverly said that he obtained two hacksaw blades and began cutting through the rear-exit lock and one cell bar. Dennis Boster, another inmate, was the lookout, and once in a while Hand would relay messages to Beverly that a guard was coming. Hand also advised Beverly on how to cut through the metal bar.

{¶ 60} According to Grimes, Beverly and Hand discussed escaping through the front of their cell block. The plan was that while Hand distracted the guards and nurses by requesting his medication, Beverly would apprehend a guard, and they would escape through the front door. Grimes also identified Hand as a lookout.

### Defense Case

{¶ 61} Sally Underwood, Hand's sister, was a bartender in the Columbus Hilltop area from 1992 until 1994. During that time, Welch frequently came into the bar selling televisions, stereos, and other electronic equipment. When asked where he obtained this property, Welch said that he "had just stolen it from a house down the street." Underwood could tell that Welch was "on something" when he entered the bar.

{¶ 62} According to Terry Neal, another inmate in Hand's cell block, Hand was not involved in the escape attempt. Dennis Boster, who was convicted of escape, also testified that Hand was not involved in the escape attempt and never served as a lookout.

{¶ 63} Hand testified in his own behalf. He said, "I did not kill my wife or have anything to do with the planning of killing my wife, either." Hand also

denied conspiring with Welch or anyone else to kill Donna or Lori. Hand did not remember "too much" about the day Donna was killed.

{¶ 64} When Hand married Lori, Welch was the best man at the wedding because his brother backed out at the last minute. Hand said that he had a great sexual relationship with Lori before his son, Robert, was born, but thereafter, they started having sexual problems. However, his business was going well, and his financial condition was "great."

{¶ 65} During his marriage to Lori, Hand took over his father's radiator shop, purchased the underlying property, and bought some extra lots. Welch worked part-time at the radiator shop and was paid under the table. Around this time, Hand embarked on a credit card scheme. He used personal credit cards, charged them to his business, and used this money to finance his business and purchase real estate.

{¶ 66} The wedding shower at his home on September 9, 1979, had been planned weeks in advance. When he learned that Lori had been killed, Hand "didn't believe it at first" and then went "hysterical." Hand later told police that he suspected that his brother, "Jimbo," had killed Lori because they were not "getting along that good and he had the keys to [Hand's] house."

{¶ 67} Shortly before Hand and Jill were married in 1992, he moved into her Delaware County home. After they had been married for a couple of years, Jill found out about Hand's credit card scheme. Hand said, "She didn't like it; * * * She just didn't want no part of it." She also learned about Hand's debt, which at one point, was close to a million dollars. Jill was also aware that Hand had life insurance on her through his credit cards.

{¶ 68} In 2000, Jill learned that Hand used her credit card to pay for repairs to one of Hand's properties. Jill was upset and wanted a "total refinance of everything." Hand then "started selling everything * * * and then paying the credit cards and the mortgages and everything down." In 2001, Hand sold his radiator shop. By May 2001, Hand had sold all his properties, had paid thousands of dollars on his credit card debt, and had gone to work as a security guard.

{¶ 69} According to Hand, he arrived home from work around 6:45 p.m. on January 15, 2002. Hand was coming out of the bathroom when he heard Jill shout, "Gerald, Gerald." He then heard a couple of shots and saw a man dressed in red flannel. Hand retrieved two guns from the bedroom dresser, and as he came out of the bedroom, he saw the intruder coming down the hallway. Hand started "firing, and * * * assumed [the intruder] was firing." However, Hand thought his guns were "misfiring because [the intruder] wasn't going down." Hand said he chased the intruder out the front door and continued firing at him

until the intruder fell on the driveway. He then returned to the house and called 911.

{¶ 70} Hand did not know how many shots he fired. He retrieved the guns and started firing, later explaining, "I wanted to protect myself * * * and shoot him, the son-of-a-bitch that shot my wife." Hand did not recognize the intruder, but recognized Welch's car in the driveway. He had no idea why Welch had come to his house that night.

{¶ 71} Hand denied telling Grimes that Welch was already in the house when he came home from work, denied telling him that Welch wanted to renegotiate his fee, and denied telling him that he killed his wife and then killed Welch. As for the escape, Hand said that he tried to stay away from Beverly as much as possible. Beverly asked Hand if he wanted to join in the escape, and Hand told him "no, and just get away." Hand also claimed that he did not aid Beverly in any way. Finally, he said that the string found in his cell was used for hanging a bag with food items to keep out the ants.

### Indictment and Trial Result

{¶ 72} The grand jury indicted Hand on two counts of aggravated murder. Count One charged Hand with the aggravated murder of Jill with prior calculation and design. Count Two charged Hand with the aggravated murder of Welch with prior calculation and design. Count One included a "course of conduct," R.C. 2929.04(A)(5), death-penalty specification. Count Two included six death-penalty specifications: one "course of conduct," R.C. 2929.04(A)(5), specification; three specifications of murdering Welch to escape detection for Hand's complicity in the murders of Donna, Lori, and Jill Hand, R.C. 2929.04(A)(3); and two specifications of murdering Welch for the purpose of preventing his testimony as a witness in the murders of Donna and Lori Hand, R.C. 2929.04(A)(8). Additionally, Hand was charged with conspiracy to commit the aggravated murder of Jill in Counts Three, Four, and Five. Counts One through Five each contained a firearm specification. In Count Six, he was also charged with escape, which encompasses attempted escape.

{¶ 73} Hand pleaded not guilty to all charges. However, the jury found Hand guilty as charged, and he was sentenced to death.

{¶ 74} Hand now appeals to this court as a matter of right.

### Trial Issues

{¶ 75} *Admissibility of Welch's statements.* In proposition of law I, Hand argues that the trial court erred in admitting Welch's statements about his complicity with Hand to murder Hand's wives. Hand argues that the testimony was not admissible under Evid.R. 804(B)(6), forfeiture by wrongdoing, or any

other hearsay exception. Additionally, Hand argues that such evidence violated his Sixth Amendment right "to be confronted with the witnesses against him." Sixth Amendment to the United States Constitution.

{¶ 76} Over defense objection, the trial court admitted Welch's statements to various witnesses describing Welch's complicity with Hand in the murders of Donna, Lori, and Jill. First, Pete Adams, Welch's cousin, testified that a week or two after Lori's murder in the fall of 1979, Welch came to his home and told him that he "killed Donna and Lori Hand" and "did it for Bob."

{¶ 77} Second, Shannon Welch, Welch's brother, testified that during July or August 2001, Welch asked Shannon "if [he] had a pistol or if [he] could get one." Welch then asked, "Do you know what I do for extra money?" Welch continued, "Well, I killed Bob's first wife and * * * I got to kill the present wife and I'll have a lot of money after that." About a week and a half before Jill's and Welch's murders, Welch told Shannon that he "might get to take care of his business with Bob tonight." On January 15, Welch told Shannon, "Well, I got to go take a shower and change clothes and be ready to go to see Bob because I might be taking care of my business tonight."

{¶ 78} Third, Barbara McKinney, described in the record as Welch's common-law wife, testified that Welch told her that he had visited Hand's home in Delaware and "Bob showed him the house." When Welch was in jail between December 2001 and January 2002, Welch directed Barbara on the phone, "Call my friend and see if he'll pay my bond to get me out of jail." Welch identified his friend as Bob Hand and said, "[D]on't say his name on the phone any more."

{¶ 79} Fourth, Tezona McKinney, Barbara's daughter, testified that on January 14, 2002, the day before the murders, Welch told her, "Well, if I get this little money * * * tomorrow, I want to buy your mother this car because I didn't buy her anything for Christmas." Welch then pointed out the car to Tezona and said, "I want your mother to have that car. And if I can, I'm going to try to make sure I get it for her, if I get this money." On another occasion, Welch told Tezona that "Bob Hand killed his first two wives."

{¶ 80} Fifth, Betty Evans, Lonnie Welch's sister, testified that around 1979 or 1980, Welch told her that if she "knew anything, not to say anything because him and Bob had a pact and if anything got out, they were going to kill each other's mother." On the evening of the murders, Welch told Evans that "he was going to pick up some money and he'd be right back; that he was sorry he didn't have anything for [her] birthday; that when he comes back, he'll take care of it."

{¶ 81} Sixth, Teresa Fountain, Shannon Welch's ex-girlfriend, testified that during 1975 or 1976, she overheard Lonnie Welch "talking to [her boyfriend] Isaac all about insurance money and knocking his boss's wife off to get some

insurance money." Later, Welch told Fountain, "I hope you didn't hear anything and * * * you keep your mouth shut, * * * you didn't hear anything."

{¶ 82} Seventh, Anna Hughes, a friend of Lonnie Welch, testified that although Welch often missed work, he was not fired from his job working for Hand. On one occasion, Welch said to her, "I didn't go to work * * * [but] I got it like that." Sometime around 1998, Welch mentioned to Hughes that he was "going out to Bob's." He added, "I've got to get me a hit and I ain't got no money."

{¶ 83} Finally, David Jordan Jr., Welch's Franklin County Jail cellmate, testified that during December 2001, Welch said that he was "going to take somebody out for this guy named Bob" and added, "I've put in work for him before." Welch offered Jordan between five and six thousand dollars to be his driver. Welch also said the murder would "happen sometime in January" and gave Jordan his phone number.

{¶ 84} **Admissibility under Evid.R. 804(B)(6).** Under Evid.R. 804(B)(6), a statement offered against a party is not excluded by the hearsay rule "if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." Evid.R. 804(B)(6) was adopted in 2001 and is patterned on Fed.R.Evid. 804(B)(6), which was adopted in 1997. Staff Notes (2001), Evid.R. 804(B)(6). To be admissible under Evid.R. 804(B)(6), the "offering party must show (1) that the party engaged in wrongdoing that resulted in the witness's unavailability, and (2) that one purpose was to cause the witness to be unavailable at trial." Id.; see, also, *United States v. Houlihan* (C.A.1, 1996), 92 F.3d 1271, 1280.

{¶ 85} Before admitting Welch's statements under Evid.R. 804(B)(6), the trial court conducted an evidentiary hearing outside the jury's presence. Welch's cousins, Pete Adams and Phillip Anthony Jr., testified that Welch told them that he had killed Donna and Lori for Hand. Anthony also testified that shortly before Jill's murder, Welch told him that he needed a gun because Hand wanted him to murder his present wife.[1] The trial court also considered the testimony of Hand's cellmate, Kenneth Grimes, that Hand had admitted killing Welch to eliminate him as a possible witness.

{¶ 86} Based on evidence at the trial and at the evidentiary hearings, the trial court found, "[T]he state has shown, by a *preponderance of the evidence* under Rule 804, that, number one, the witness, accomplice, victim, Lonnie Welch's death was caused by the defendant, and it's obviously by virtue of that to cause his unavailability." (Emphasis added.) The trial court then ruled that Welch's statements were admissible. After conducting further evidentiary hearings with other witnesses, the trial court admitted the remainder of Welch's statements.

---

1. Anthony was not called as a prosecution witness during the state's case-in-chief.

{¶ 87} Hand alleges several reasons why the trial court erred in admitting Welch's statements under Evid.R. 804(B)(6). First, Hand argues that the trial court should have used the clear-and-convincing standard of proof, rather than a preponderance-of-the-evidence standard, in proving the predicate facts. However, the majority of United States Courts of Appeals applying the federal rule have followed the preponderance-of-the-evidence standard in ruling on preliminary determinations of admissibility under Fed.R.Evid. 804(B)(6). See *Cotto v. Herbert* (C.A.2, 2003), 331 F.3d 217, 235; *United States v. Scott* (C.A.7, 2002), 284 F.3d 758, 762; *United States v. Cherry* (C.A.10, 2000), 217 F.3d 811, 820; *United States v. Zlatogur* (C.A.11, 2001), 271 F.3d 1025, 1028; see, also, *Steele v. Taylor* (C.A.6, 1982), 684 F.2d 1193, 1202 (preponderance standard in making preliminary findings in waiver-by-misconduct cases); *State v. Boyes*, Licking App. Nos. 2003CA0050 and 2003CA0051, 2004-Ohio-3528, 2004 WL 1486333, ¶ 54–56 (applying the preponderance standard in determining whether the foundational requirements for Evid.R. 804(B)(6) were met). Thus, the trial court properly applied the preponderance-of-the-evidence standard in ruling on admissibility.

{¶ 88} Second, Hand argues that the trial court erred in admitting Welch's statements without first considering Hand's affirmative defense of self-defense. However, Hand failed to offer any evidence of self-defense during the evidentiary hearing, although the defense had the opportunity to do so. Thus, the trial court made the appropriate ruling based on the evidence before the court.

{¶ 89} Third, Hand contends that Welch's statements were not admissible under Evid.R. 804(B)(6), because the state failed to show that Hand's purpose in killing Welch was to make him unavailable as a witness. Hand argues that when Welch was killed, there were no pending charges and no evidence that Welch intended to testify against him at trial. We reject this argument.

{¶ 90} Evid.R. 804(B)(6) "extends to potential witnesses." Staff Notes (2001), Crim.R. 804(B)(6); *United States v. Houlihan*, 92 F.3d at 1279 (rule applies with "equal force if a defendant intentionally silences a *potential* witness." (Emphasis sic.) Thus, the absence of pending charges against Hand at the time he killed Welch did not preclude the admissibility of Welch's statements. Moreover, the state need not establish that Hand's sole motivation was to eliminate Welch as a potential witness; it needed to show only that Hand "was motivated *in part* by a desire to silence the witness." (Emphasis sic.) Id. at 1279; *United States v. Dhinsa* (C.A.2, 2001), 243 F.3d 635, 654. Hand's admissions to Grimes clearly established that one of Hand's purposes was to eliminate Welch as a potential witness.

{¶ 91} Finally, Hand argues that the trial court erred in admitting Welch's statements because they were not reliable. Hand claims that the witnesses were not credible because they were Welch's friends, family members, and a cellmate.

Moreover, Hand contends that Welch's friends and family members were angry at him for killing Welch.

{¶ 92} Following the evidentiary hearings and before admitting Welch's statements under Evid.R. 804(B)(6), the trial court found that each witness was credible. The decision whether to admit these hearsay statements was within the trial court's discretion. See *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus (the admission of relevant evidence rests within the sound discretion of the trial court); cf. *State v. Landrum* (1990), 53 Ohio St.3d 107, 114, 559 N.E.2d 710 ("[T]he determination of whether corroborating circumstances are sufficient to admit statements against penal interest, as a hearsay exception, generally rests within the discretion of the trial court").

{¶ 93} No evidence supports Hand's allegations that Welch's friends and family members were not telling the truth, and their bias could have been explored on cross-examination. Indeed, courts generally hold that "where a declarant makes a statement to someone with whom he has a close personal relationship, such as a spouse, child, or friend, * * * that * * * relationship is a corroborating circumstance *supporting* the statement's trustworthiness." (Emphasis sic.) *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 53; see, also, *United States v. Tocco* (C.A.6, 2000), 200 F.3d 401, 416 (declarant's statements to his son in confidence considered trustworthy); *Latine v. Mann* (C.A.2, 1994), 25 F.3d 1162, 1166–1167 (reasoning that statements made to a perceived ally rather than to a police officer during an interrogation are trustworthy). Moreover, the testimony of Welch's friends and family members was corroborated by Jordan, Welch's cellmate, and Grimes, who testified that Hand admitted hiring Welch to kill Jill.

{¶ 94} Based on the foregoing, we find that the trial court did not abuse its discretion in admitting Welch's statements under Evid.R. 804(B)(6).

{¶ 95} **Admissibility under other evidentiary rules.** We further find that Welch's statements were admissible as statements against interest (Evid.R. 804(B)(3)), as a statement of intent (Evid.R. 803(3)), and as a co-conspirator's statement (Evid.R. 801(D)(2)(e)).

{¶ 96} First, Evid.R. 804(B)(3) provides a hearsay exception where the declarant is unavailable as a witness. This rule states: "(3) *Statement against interest.* A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible

unless corroborating circumstances clearly indicate the trustworthiness of the statement."

{¶ 97} Welch's statements admitting his involvement in murdering Hand's wives qualified for admissibility under Evid.R. 804(B)(3). Welch's statements to Adams, Shannon, and Jordan implicating Hand in the murders were also admissible.[2] *State v. Madrigal* (2000), 87 Ohio St.3d 378, 721 N.E.2d 52, paragraphs one and three of the syllabus (out-of-court statements made by an accomplice that incriminate the defendant may be admitted as evidence if the statement contains adequate indicia of reliability); see, also, *State v. Issa* (2001), 93 Ohio St.3d 49, 60, 752 N.E.2d 904; *Lilly v. Virginia* (1999), 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117, fn. 5. As in *Issa*, Welch's statements were voluntarily made to family and friends. Moreover, in his statements, Welch did not attempt to shift blame from himself, because he admitted his role as the shooter in multiple killings. *Issa*, 93 Ohio St.3d at 61, 752 N.E.2d 904. Thus, the circumstances surrounding Welch's statements did render Welch particularly worthy of belief. See id.

{¶ 98} Second, Evid.R. 803(3) creates a hearsay-rule exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed."

{¶ 99} Under Evid.R. 803(3), statements of current intent to take future actions are admissible for the inference that the intended act was performed. See *Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 33; *Sage*, 31 Ohio St.3d at 182–183, 31 OBR 375, 510 N.E.2d 343; see, generally, *Mut. Life Ins. Co. of New York v. Hillmon* (1892), 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706. Not all of Welch's statements were admissible under this rule. However, Welch's statement to Shannon, "I got to kill the present wife and I'll have a lot of money after that," was admissible under Evid.R. 803(3) to prove that Welch later acted in conformity with that intention. Welch's statement to Shannon, "I got to * * * be ready to go to see Bob because I might be taking care of my business tonight," was also admissible as evidence of his intention. Similarly, Welch's statement to Evans on the night of the murders that "he was going to pick up some money and he'd be right back" was admissible to help show that Welch intended to meet with Hand and collect money from him for shooting Jill. Finally, Welch's statement to Jordan that he intended to "take somebody out for * * *

---

2. Tezona McKinney's testimony, "Welch told me that Bob Hand killed his first two wives," is not a statement against Welch's interest and is therefore not admissible under Evid.R. 804(B)(3).

Bob" and planned to do so "sometime in January" was admissible to help prove that Welch later went to Hand's home to carry out this plan.

{¶ 100} Third, Evid.R. 801(D)(2)(e) provides: "A statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Statements of co-conspirators are not admissible under Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof. *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus. However, explicit findings of a conspiracy's existence need not be made on the record. *State v. Robb* (2000), 88 Ohio St.3d 59, 70, 723 N.E.2d 1019.

{¶ 101} Welch's statements to Shannon and Jordan were admissible under Evid.R. 801(D)(2)(e). Hand's statements to his cellmate, Grimes, provided independent proof of the conspiracy's existence. See *State v. Duerr* (1982), 8 Ohio App.3d 396, 400, 8 OBR 511, 457 N.E.2d 834 (defendant's own statements can provide "independent proof" of the conspiracy). Hand called Welch a business partner and said he had hired Welch to kill his wife.

{¶ 102} The facts show that by July 2001, Hand and Welch had entered into a conspiracy to murder Jill. During that period of time, Welch began asking Shannon whether he had a pistol so that Welch could kill Hand's wife. Welch's ongoing requests for a pistol and his conversations with Shannon about murdering Jill were within the scope of the conspiracy. Further, Welch's December 2000 and January 2001 jailhouse conversations with Jordan about the murder were also within the scope of the conspiracy.

{¶ 103} **Right to Confrontation.** Hand contends that the admission of Welch's statements under Evid.R. 804(B)(6) violated his Sixth Amendment right to confrontation. In making this argument, Hand relies upon the Supreme Court's recent decision in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. However, we reject Hand's claims.

{¶ 104} In *Crawford,* the Supreme Court held that it is a violation of the Confrontation Clause to admit "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (overruling *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, which held that statements from an unavailable witness may be admissible without violating the Confrontation Clause if the statements had been found to be reliable).

{¶ 105} However, *Crawford* explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is

responsible for a witness's unavailability. Id. at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177 ("[t]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability"). See, also, *Reynolds v. United States* (1879), 98 U.S. 145, 158, 25 L.Ed. 244 (if a witness is unavailable because of the defendant's own misconduct, "he is in no condition to assert that his constitutional rights have been violated").

{¶ 106} The trial court's preliminary determination that Welch's statements were admissible included a finding that Hand killed Welch to eliminate him as a potential witness. Indeed, Hand admitted to Grimes that he killed Welch to achieve that purpose (i.e., prevent him from being a witness against him). Thus, Hand forfeited his right to confront Welch because his own misconduct caused Welch's unavailability. See *United States v. Garcia–Meza* (C.A.6, 2005), 403 F.3d 364, 369–370 (defendant forfeited his right to confront his wife because his wrongdoing—i.e., his murder of her—was responsible for her unavailability).

{¶ 107} Finally, the admission of Welch's statements on the basis of Evid.R. 804(B)(3), Evid.R. 803(3), or Evid.R. 801(D)(2)(e) would not violate Hand's Sixth Amendment right to confront witnesses, because he killed Welch and thereby made him unavailable to testify. Such waiver by misconduct is consistent with *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. Indeed, *Crawford's* affirmation of the "essentially equitable grounds" for the rule of forfeiture shows that the rule's applicability does not hinge on the evidentiary basis for the testimony's admissibility. Id. at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177. See *Garcia–Meza*, 403 F.3d at 370–371; *United States v. Thompson* (C.A.7, 2002), 286 F.3d 950, 963, citing *United States v. Cherry* (C.A.10, 2000), 217 F.3d 811, 820 (applying waiver-by-misconduct rule to co-conspirator).

{¶ 108} Based on the foregoing, we overrule proposition of law I.

{¶ 109} *Other evidentiary issues.* In proposition of law II, Hand argues that the prosecutor's closing argument improperly mentioned evidence of Hand's fraudulent business practices and improperly presented "other acts" evidence. Hand also argues that the trial court failed to provide the jury with adequate limiting instructions. However, except where mentioned, the defense failed to object and waived all but plain error. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 110} **1. Mentioning fraudulent business practices during closing argument.** Allen Peterson, Hand's accountant, prepared the corporate income tax returns for Hand's radiator business and testified that the business suffered financial losses for a number of years before going out of business.

{¶ 111} The defense objected to evidence of Hand's tax returns as irrelevant and moved to strike Peterson's entire testimony. In overruling the defense objection, the trial court provided the jury with the following limiting instruction: "Exhibits that were admitted, being the tax returns from yesterday, those are admitted solely for showing a motive. They are not to be construed * * * in any other way, for any other purpose, such as how record keeping may have taken place, strictly on that sole issue."

{¶ 112} Hand testified in his own behalf and stated that he paid Welch and Adams "cash under the table" to avoid paying withholding taxes and to avoid a paper trail. Hand also admitted that he had not filed a personal federal income tax return for at least 15 years.

{¶ 113} During the closing argument, the prosecutor reviewed evidence of Hand's business practices and made the following argument:

{¶ 114} "And did you catch his statement * * * about he and his father like to save on their taxes by paying employees under the table in cash? We all know that tax avoidance is common in this country, but what he calls saving on taxes is actually fraud. The fact that he so breezily engaged in that kind of behavior * * * *tells us much about his respect for the law and his willingness to lie and deceive.* This wasn't just a rinky-dink, every once in a while practice, that the defendant engaged in during the slow season of his business. Exhibit 275, prepared by Detective Otto, indicates that the defendant billed more than one hundred thousand dollars fraudulently to his own business on his own credit cards. *This was fraud on a massive scale, and it exemplifies the way in which this man operates.*" (Emphasis added.)

{¶ 115} Hand concedes that evidence of his financial situation was proper to prove motive. However, Hand contends that the prosecutor improperly argued that his illegal business practices showed that he did not hesitate to violate the law in general.

{¶ 116} The prosecution is entitled to significant latitude in its closing remarks. The prosecutor may comment on " 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773. As to defense witnesses, including the defendant, the prosecutor may comment upon their testimony and suggest the conclusions to be drawn therefrom. The prosecutor may state that "the evidence supports the conclusion that the defendant is not telling the truth, is scheming, or has ulterior motives for not telling the truth." See *State v. Finkes* (Mar. 28, 2002), Franklin App. No. 01AP–310, 2002 WL 464998, *9; *State v. Draughn* (1992), 76 Ohio App.3d 664, 670, 602 N.E.2d 790.

{¶ 117} Hand's credibility was at issue because he testified in his own defense. The prosecutor's characterization of Hand's behavior as fraud and his argument that Hand's illegal business practices showed his "willingness to lie and deceive" represented fair comment on Hand's credibility. However, the argument that Hand committed "fraud on a massive scale, and it exemplifies the way in which this man operates" represented an overly broad comment on Hand's character. Nevertheless, we find no plain error in view of the overwhelming evidence of Hand's guilt. Cf. *State v. Rahman* (1986), 23 Ohio St.3d 146, 154–155, 23 OBR 315, 492 N.E.2d 401.

{¶ 118} **2. Reaction to wives' deaths.** Hand contends that testimony about his reaction to news about Lori's and Jill's murder was improper "other acts" evidence. Sam Womeldorf, a now retired Columbus homicide detective, was involved in the murder investigations of Donna and Lori. Womeldorf described Hand's demeanor after Hand was notified of Lori's death:

{¶ 119} "A: In dealing with Bobby on the * * * death of his first wife, I noticed that Bobby carried on; he was not exactly honest with me * * * in particular things. * * * And I noticed that when Bobby came this time, he was very similar to the first time, he carried on, and * * * stomping and * * * demanding to go in the house and the same thing he did on the other one. And you would think he was crying, however, * * *—

{¶ 120} "Mr. Sherman: I'm going to object. This is all opinion.

{¶ 121} "The Court: Overruled.

{¶ 122} " * * *

{¶ 123} "A: I noticed he wasn't crying; there were no tears."

{¶ 124} Evid.R. 701, which governs opinion testimony by lay witnesses, provides: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

{¶ 125} Womeldorf's testimony satisfied both requirements of Evid.R. 701. Womeldorf personally observed Hand's demeanor, and the lack of grief was relevant in showing Hand's strange reaction after learning that Lori had been killed. See *State v. Griffin*, Hamilton App. No. C–020084, 2003-Ohio-3196, 2003 WL 21414664, ¶ 37–38 (testimony that defendant "began to cry and sob, but there were no tears" admissible as lay opinion); cf. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 463, 705 N.E.2d 329 (testimony that witness appeared "scared" and "not able to think" admissible as lay opinion). We find that the trial court did not abuse its discretion in admitting this testimony. See *Sage*, 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 126} Hand also claims that Abel Gonzalez, Hand's son-in-law, improperly testified that Hand failed to show remorse following Jill's death. Two to three weeks after Jill's death, Abel talked to Hand about Jill's estate. During his testimony, Abel was asked about Hand's demeanor:

{¶ 127} "Q: What was his demeanor when you had this conversation with him?

{¶ 128} "A: It was just a matter of fact. It was more like just a business conversation, let's say.

{¶ 129} "Q: Did he ever say he missed Jill?

{¶ 130} "A: No.

{¶ 131} "Q: Did he act sad about what had happened?

{¶ 132} "A: I can't say he was sad; no."

{¶ 133} Hand's emotional reaction two to three weeks after Jill's death was of questionable relevance. However, we find that Gonzalez's testimony did not constitute outcome-determinative plain error in view of the compelling evidence of Hand's guilt.

{¶ 134} 3. **Sex-related testimony**. At trial, Womeldorf testified that Hand told him: "[Lori] was cold and he was a horny old man. * * * [He] wanted sex at least once a night and she didn't want to do that." Hand argues that this testimony was improperly admitted.

{¶ 135} The admission of Hand's statement about his sexual relations with Lori was a matter of relevancy. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We find that testimony about Hand's frequent desire for sex and his wife's lack of that interest was relevant as a possible motive for Lori's murder.

{¶ 136} Hand also argues that testimony that he was infatuated with Barbara McKinney's daughter was improper other-acts evidence. Barbara's testimony included the following questioning:

{¶ 137} "Q: Did you ever see Lonnie Welch and Bob Hand get together when you lived at the home on King Edward Avenue?

{¶ 138} "A: Bob Hand used to come to our house and pick Lonnie up frequently. And he also had an infatuation, I guess, for my youngest daughter."

{¶ 139} Barbara's nonresponsive remark was harmless, and her testimony was not repeated. Given the overwhelming evidence of Hand's guilt, we find that this isolated remark did not result in outcome-determinative plain error.

{¶ 140} 4. **Interest in "true crime" stories**. Hand also claims that testimony that he read "true crime" stories was improperly admitted. William Bowe, a

childhood friend of Hand, testified, "[W]hen we [were] younger," Hand liked to read about "the perfect crime and stuff like that."

{¶ 141} Hand's childhood interest in crime stories was only marginally relevant in showing that Hand may have used information about police work to manipulate the crime scene at his Delaware home. However, we find that the testimony did not result in outcome-determinative plain error.

{¶ 142} 5. **Forcing his father out of business and Hand's obsession with money.** Hand contends that the state improperly introduced evidence that he forced his father out of his radiator business and was obsessed with money. Bowe worked for ten years at Hand's radiator shop. During his testimony, Bowe explained why he left the shop:

{¶ 143} "Q: And you said you worked there about ten years, until 1980, I gather?

{¶ 144} "A: Yeah; * * * he bought the building—

{¶ 145} "Q: You mean—

{¶ 146} "A: Bob.

{¶ 147} "Q: Okay; the defendant.

{¶ 148} "A: He kicked his dad out of there.

{¶ 149} "Q: What do you mean?

{¶ 150} "A: Well, I don't know. They had an argument or something, and the next thing I know, he's smashing the windows out of the shop and said you got three days to move out of here.

{¶ 151} "Q: Who is he saying that to?

{¶ 152} "A: To his dad.

{¶ 153} "Q: I see.

{¶ 154} "A: So we did move, and I went with his dad."

{¶ 155} This evidence established that Hand took over the radiator business and then hired Welch to work for him. Testimony that Hand fired his father and gave him three days to leave the shop was of highly questionable relevance. But we find that the evidence did not result in outcome-determinative plain error.

{¶ 156} Hand also argues that testimony that he was obsessed with money was improperly introduced. Here, Bowe testified:

{¶ 157} "Q: * * * Do you have any knowledge about the defendant's views toward money, finances?

{¶ 158} "A: No; everybody knows Bob, and that's been his big thing in life is how much money he can get in his pocket. He's a money person.

{¶ 159} "Q: And why do you say that?

{¶ 160} "A: Ever since we was kids, * * * his quest in life is money."

{¶ 161} We find that Bowe's opinion testimony was admissible under Evid.R. 701 because it was based upon his lifelong relationship with Hand, and Bowe's opinion helped to explain Hand's financial motives.

{¶ 162} **6. Limiting instructions.** Hand argues that the trial court erred by not providing limiting instructions on the admissibility of "other acts" evidence. As discussed earlier, the trial court provided the jury with limiting instructions on the consideration of Hand's tax returns. However, the defense did not request any further limiting instructions at the end of the guilt-phase evidence. Hand's failure to request such instructions waived all but plain error. In any event, nothing suggests that the jury used other-acts evidence to convict Hand on the theory that he was a bad person. Thus, we find that the trial court's failure to give further limiting instructions did not constitute plain error. See *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50.

{¶ 163} Based on the foregoing, proposition of law II is overruled.

{¶ 164} *Joinder of escape charge.* In proposition of law III, Hand contends that the trial court erred in denying his motion to sever Count Six, the escape charge, from the rest of the charges.

{¶ 165} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293, citing *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288.

{¶ 166} A defendant requesting severance has the "burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *Torres*, 66 Ohio St.2d at 343, 20 O.O.3d 313, 421 N.E.2d 1288. A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing separate trials. Id. Here, the trial court did not abuse its discretion in denying the motion to sever. Nor was Hand prejudiced by the joinder.

{¶ 167} First, Hand's participation in the escape attempt was evidence of flight and was admissible as tending to show his consciousness of guilt. Indeed, an accused's " 'flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' " *State v. Eaton* (1969), 19 Ohio

St.2d 145, 160, 48 O.O.2d 188, 249 N.E.2d 897, quoting 2 Wigmore on Evidence (3d Ed.1979) 111, Section 276; see, also, 1 Giannelli & Snyder, Evidence (2d Ed.2001) 167–170, Section 401.9.

{¶ 168} The defense did not challenge instructions on evidence of flight at trial. However, Hand now contends that his minimal participation in the escape attempt would not have been admissible as evidence of flight if he had had a separate murder trial. We reject that argument because Hand was actively involved in the escape attempt. Beverly testified that Hand served as a lookout when Beverly was sawing through the cell bars, Hand provided advice on how to cut through the metal bars, and Hand talked to Beverly about alternative ways of escaping. Moreover, Grimes testified that Hand and Beverly devised a plan to escape through the front of the cell block. Under this plan, Hand would "sidetrack the nurses and guards and Mr. Beverly would go and apprehend one of the guards * * * and they would go through the front door, because time was getting near for both of them, and the door wasn't ready to come through."

{¶ 169} Hand also argues that joinder was not justified, because more than nine months elapsed between the murders (January 15, 2002) and the escape attempt (October 30, 2002, through November 26, 2002). However, admissibility of evidence of flight does not depend upon how much time passes between the offense and the defendant's flight. See *State v. Alexander* (Feb. 26, 1987), Cuyahoga App. No. 51784, 1987 WL 7079, *2. Indeed, flight on the eve of trial can carry the same inference of guilt as flight from the scene. Id. Here, Hand's escape attempt occurred while pretrial hearings were underway. Thus, this argument also lacks merit.

{¶ 170} Finally, the evidence of Hand's guilt is "amply sufficient to sustain each verdict, whether or not the indictments were tried together." *Torres,* 66 Ohio St.2d at 344, 20 O.O.3d 313, 421 N.E.2d 1288. In this case, circumstantial evidence, forensic testimony, Welch's statements, and Hand's own statements proved Hand's guilt of the murders. Additionally, Grimes's and Beverly's testimony provided independent evidence of Hand's guilt of escape. Thus, the strength of the state's proof "establishes that the prosecution did not attempt to prove one case simply by questionable evidence of other offenses." *State v. Jamison* (1990), 49 Ohio St.3d 182, 187, 552 N.E.2d 180.

{¶ 171} Based on the foregoing, we overrule proposition of law III.

{¶ 172} *Sufficiency of the evidence of escape.* In proposition of law IV, Hand challenges the sufficiency of the evidence for his conviction of escape in Count Six.

{¶ 173} In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 174} Hand argues that the evidence of escape was insufficient because there was no evidence that he planned the unsuccessful escape attempt or directly assisted in cutting the locks or hiding the tools. Hand also contends that the testimony that he was acting as a lookout, if true, was insufficient to convict him.

{¶ 175} The record refutes Hand's claims. Testimony showed that Hand served as a lookout when Beverly was sawing through the cell bars, provided advice to Beverly on cutting through the cell bars, and helped devise an alternative plan to escape through the front door of the jail. Moreover, circumstantial evidence supported Hand's guilt. This evidence consisted of some torn-up tee-shirt material and a pencil with a piece of tee-shirt tied around it found in Hand's cell after the aborted escape attempt. According to Delaware County Detective Brian Blair, "[t]hese pieces of cloth are consistent to what was tied to the saw blades and it's consistent to what inmates do to hide things * * * so they can be easily accessed by pulling on this after tying something to it, i.e., saw blades." Thus, the evidence established that Hand actively participated in the escape attempt.

{¶ 176} Finally, even assuming that the evidence established only that Hand was acting as a lookout, Hand was an accomplice in the attempted escape. See *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158, ¶ 29, citing *State v. Trocodaro* (1973), 36 Ohio App.2d 1, 5, 65 O.O.2d 1, 301 N.E.2d 898 (aiding and abetting established by overt acts such as serving as a lookout). Under R.C. 2923.03(F), an accomplice "shall be prosecuted and punished as if he were a principal offender." See, also, *State v. Bies*, 74 Ohio St.3d at 325, 658 N.E.2d 754.

{¶ 177} Based on the foregoing evidence, viewed in the light most favorable to the prosecution, we find that sufficient evidence supports Hand's conviction for escape. Thus, we overrule proposition of law IV.

{¶ 178} *Amended bill of particulars.* In proposition of law V, Hand argues that the trial court erred in permitting the state to amend the bill of particulars at the close of the evidence and to argue that Hand was a complicitor. He also argues that the trial court erred in instructing the jury on complicity.

{¶ 179} Before trial, the state provided the defense with a bill of particulars that set forth in Count One that "on or about the 15th day of January, 2002, the Defendant did, purposefully and with prior calculation and design, cause the death of Jill J. Hand by means of a firearm." On May 28, 2003, at the close of the evidence and prior to final instructions, the state provided the defense with an amended bill of particulars. The amendment to Count One stated that Hand

killed Jill "by firing that weapon himself, or by soliciting or procuring Walter 'Lonnie' Welch to commit the offense, and in either case, the defendant acted purposely and with prior calculation and design." The defense objected to the proposed complicity instructions because of the late notice of complicity in the amended bill of particulars. Thereafter, the trial court instructed the jury on complicity to commit murder.

{¶ 180} Crim.R. 7(E) states: "[Upon timely request or court order], the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense. A bill of particulars may be amended at any time subject to such conditions as justice requires." Crim.R. 7(D) authorizes the court to amend a bill of particulars "before, during, or after a trial," provided that "no change is made in the name or identity of the crime charged."

{¶ 181} Hand argues that because the original bill of particulars indicated that he was the principal offender on Count One, he lacked notice that the trial court would instruct on complicity on that count. However, this claim lacks merit. R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." This provision adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407–408.

{¶ 182} Additionally, for the amendment to constitute reversible error, Hand must demonstrate that the amendment hampered his defense or prejudiced him. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 569, 709 N.E.2d 1166. Hand fails to point out how he could have defended himself differently, given notice that complicity would also be an issue as to Count One. From the beginning of the police investigation into Jill's murder, Hand claimed that he was not involved in Jill's murder. Hand asserted that Welch was an intruder into his home and that Welch shot Jill. Hand's denial of involvement in Jill's murder would not have changed the main thrust of his defense regardless of whether the state proceeded on the theory that Hand was the principal or a complicitor. See *State v. Herring* (2002), 94 Ohio St.3d 246, 251, 762 N.E.2d 940 (rejecting defense claims of prejudice from late notice of the state's complicity theory). Thus, we find that Hand's claims of prejudice are speculative and lack merit.

{¶ 183} Moreover, we reject Hand's complaint about lack of notice because Hand did not request a continuance upon receiving the amended bill of particulars. Clearly, the defense could have requested a continuance if counsel needed additional time to prepare a defense to the complicity theory.

{¶ 184} In sum, Hand was not misled or prejudiced by the state's notification of complicity in the amended bill of particulars. Moreover, the trial court did not err in instructing on complicity. Thus, proposition of law V is overruled.

{¶ 185} *Course-of-conduct instructions.* In proposition of law VI, Hand argues that the course-of-conduct instruction was defective in failing to specify the names of the murder victims covered by the specification. He also attacks the course-of-conduct instruction as unconstitutionally vague.

{¶ 186} **1. Constitutional challenge.** "The course-of-conduct specification set forth in R.C. 2929.04(A)(5) is not void for vagueness under either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution." *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, syllabus. Accord *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144; *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 661 N.E.2d 1030. We find no basis to overturn that ruling.

{¶ 187} **2. Trial court's course-of-conduct instruction.** The bill of particulars specified that the course of conduct set forth in Specification One of Count One and Count Two involved the murders of "Jill J. Hand and Walter M. 'Lonnie' Welch, and the course of conduct began and ended on January 15, 2002." The guilt-phase instructions on course of conduct in Specification One of Count One stated:

{¶ 188} "Before you can find the defendant guilty of Specification One, under the first count of the indictment, you must find beyond a reasonable doubt that the aggravated murder of Jill [J.] Hand was part of a course of conduct involving the purposeful killing of two or more persons by the defendant."

{¶ 189} The guilt-phase instructions on course of conduct in Specification One of Count Two stated:

{¶ 190} "Before you can find the defendant guilty of Specification One, under the second count of the indictment, you must find beyond a reasonable doubt that the aggravated murder of Walter Lonnie Welch was part of a course of conduct involving the purposeful killing of two or more persons by the defendant."

{¶ 191} The defense never objected to either of these instructions and thus waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 192} First, Hand complains about the lack of guidance for determining whether two or more murders occurred as part of a course of conduct. However, after the completion of briefing in this case, we decided *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, which sets forth a test for course of conduct: "The statutory phrase 'course of conduct' found in R.C. 2929.04(A)(5) requires that the state *establish some factual link* between the aggravated

murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together.'" (Emphasis added.) Id. at the syllabus, quoting *State v. Cummings* (1992), 332 N.C. 487, 510, 442 S.E.2d 692. Moreover, "the factual link might be one of time, location, murder weapon, or cause of death." *Sapp* at ¶ 52. Ultimately, "when two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), all the circumstances of the offenses must be taken into account." Id. at ¶ 56.

{¶ 193} The facts surrounding the murders of Jill and Welch meet *Sapp*'s criteria for course of conduct. The two murders occurred at the same time and place, and Hand had related motives for the murders. Hand's motive in murdering Jill was to collect her life insurance and pay off his massive debts. Hand's motive in murdering Welch was to eliminate the witness against him for Jill's murder and the murders of his previous two wives. Thus, the two offenses were related by time, place, and motive and establish a single course of conduct.

{¶ 194} Second, Hand contends that the instructions were deficient by failing to specify Jill's and Welch's murders as the subject of the course-of-conduct specifications. Hand argues that this lack of specificity resulted in prejudicial error because the jury might have also considered Donna's and Lori's murders as part of the course of conduct. The two course-of-conduct specifications accompanied the murder counts for Jill's and Welch's murders. However, there were no murder counts for Donna's and Lori's murders. Under these circumstances, the jury was not misled and could reasonably find that the course-of-conduct related only to Jill's and Welch's murders. Thus, we find no plain error.

{¶ 195} Moreover, there was no risk that the defense suffered any prejudicial error. During the penalty-phase instructions, the trial court advised the jury:

{¶ 196} "The aggravating circumstance that you shall consider as to Count One of the indictment involving the death of Jill Hand is that this offense was part of a course of conduct involving the purposeful killing of Jill J. Hand and Walter Lonnie Welch by the defendant."

{¶ 197} Thus, the penalty-phase instructions clearly stated that Jill's and Welch's murders were the subject of the course-of-conduct aggravating circumstance. See *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 ("[i]t is presumed that the jury will follow the instructions given to it by the judge"). Thus, there was no risk that the jury sentenced Hand to death for the murders of Donna and Lori.

{¶ 198} In sum, we find no outcome-determinative plain error, and proposition of law VI is overruled.

{¶ 199} *Ineffective assistance of counsel.* In proposition of law VII, Hand raises numerous instances of ineffective assistance of counsel during the guilt phase. Reversal of a conviction for ineffective assistance of counsel "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 200} **1. Voir dire of Juror Lombardo.** Hand claims that his counsel were ineffective for failing to explore the bias of Juror Lombardo, a seated juror, and strike her from the jury. However, " '[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.' " *Cornwell*, 86 Ohio St.3d at 568, 715 N.E.2d 1144, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 747 N.E.2d 765.

{¶ 201} Hand contends that his counsel failed to explore Juror Lombardo's bias after she disclosed that her husband had worked with Jill Hand. Juror Lombardo stated that her husband, an investigator with the Ohio Attorney General, "had worked with [Jill] on and off for about 12 years. She was with DMV [Division of Motor Vehicles] and * * * he had an investigation regarding the DMV." Thereafter, Juror Lombardo was asked whether she would be able to fairly consider the testimony of witnesses who worked with the Attorney General's Office. Juror Lombardo stated that she would "listen to their testimony separate from [her] husband's work, absolutely." Juror Lombardo also assured counsel that "[i]t would not be difficult at all" to separate what happens at trial from her husband. Thus, counsel did question Juror Lombardo about her bias, and her responses indicated that her husband's job would not influence her performance as a juror.

{¶ 202} Hand also argues that his counsel were deficient by failing to inquire further about the death of Juror Lombardo's daughter. This segment of voir dire occurred as follows:

{¶ 203} "Mr. Cline: In the course of listening to whatever comments were made, how did you feel about what you were hearing?

{¶ 204} "Ms. Lombardo: Well, I lost a daughter in the past and I pretty much went through a lot of stuff. I felt very sad, but I really didn't pursue it. I just

really have a yearning to know more about it. Of course, I had feelings about it, sadness. I would still need to know more about what happened.

{¶ 205} "Mr. Cline: On your questionnaire, the question was asked if you had started to form any opinions and I think you marked, 'Not sure.' Then your next comment was, 'Mr. Hand is entitled to a fair and just trial.'

{¶ 206} "Ms. Lombardo: He absolutely is."

{¶ 207} Hand argues that Ms. Lombardo's response about her daughter's death raised issues of potential bias that his counsel was obligated to pursue. However, Hand's claim of potential bias is speculative. Juror Lombardo had earlier assured the court that she could decide the case solely upon the evidence and agreed to set aside her personal beliefs and follow the law in deciding the case. Moreover, the follow-up question eliciting Juror Lombardo's reaffirmation that Hand was entitled to a fair trial diminished the likelihood that her daughter's death was a potential source of bias. Given these circumstances, we find that trial counsel's decision not to question Juror Lombardo any further about the loss of her daughter, a very personal issue, was a proper exercise of discretionary judgment. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 490, 721 N.E.2d 995.

{¶ 208} Finally, Hand argues that his counsel were deficient in failing to challenge Juror Lombardo for bias after she disclosed that she had witnessed workplace violence. About 30 years earlier, Juror Lombardo had seen her boss confront an intruder where she worked. She later learned that her boss had shot the man. Juror Lombardo was a witness in the subsequent murder trial, and her testimony supported the jury's decision that her boss had acted in self-defense. During a follow-up question, the trial counsel asked Juror Lombardo, "Do you believe that a person who has been put in danger, or his life is threatened should have the right to defend himself or herself?" Juror Lombardo answered, "Yes."

{¶ 209} Here, Juror Lombardo's views about self-defense were favorable to the defense because Hand claimed that he killed Welch in self-defense. Thus, we reject Hand's claim that his counsel were ineffective by failing to challenge Juror Lombardo for cause or peremptorily because of her prior experience with workplace violence. See *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 54–56.

{¶ 210} **2. Failure to call a defense witness.** Hand also argues that his counsel were ineffective by failing to call Phillip Anthony, Welch's cousin, as a defense witness.

{¶ 211} During the evidentiary hearing on the admissibility of Welch's statements, Anthony testified that sometime during 1986 or 1987, Welch admitted killing Donna and Lori. Welch also told Anthony that he had "snuck into a basement window and that all the doors and windows in the house were sealed

and locked, * * * and made the second murder identical to the first." Retired Police Detective Sam Womeldorf, the investigator of Donna's death, had earlier testified that the basement "windows were locked on the inside. It appeared that no entry was made through either of these windows." Retired Police Lieutenant Robert Britt, who had been an investigator into Lori's death, also testified that the basement windows were locked.

{¶ 212} The trial court ruled that Anthony's testimony was admissible, but the state decided not to call Anthony as a witness. However, Hand argues that his counsel were deficient in not calling Anthony as a witness, because Welch's statements contradicted police testimony that the basement windows were not the entry point for the killer.

{¶ 213} "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 739 N.E.2d 749; *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 82. Welch's statement to Anthony that he entered the basement window to kill Donna and Lori appears to contradict police testimony. However, Anthony's testimony would have also strengthened the state's case.

{¶ 214} During the evidentiary hearing, Anthony testified that Welch discussed the plans to kill Jill. During the first two weeks of January 2002, Welch asked Anthony to find him a gun. Anthony testified that Welch said he needed a gun, explaining, " '[T]he guy I did that thing for * * * said he wants me to do another one.' " Welch told him, "I need this [gun] now * * * I can't wait a week, I can't wait a day, I really need this now, I've got something to do." On the night before the murders, Welch asked whether Anthony had found him a gun, and Anthony told him no. Welch expressed his unease about meeting Hand and asked Anthony for a ride to Hand's house to "watch [his] back a little bit." Welch indicated that he "wasn't going up there to kill nobody. The deal was * * * they were going up there to iron it out. How much, where, how, when, type of situation." Thus, Welch was "planning to go up, talk to Mr. Hand, iron out all the specifics of the murder, and that's it."

{¶ 215} Trial counsel were not deficient by choosing not to call Anthony as a defense witness even though some of his testimony might have helped the defense case. Welch's comments to Anthony showed a sense of urgency to obtain a weapon to murder Jill that was not otherwise in evidence. Moreover, Welch's statements show that he did not intend to murder Jill when he went to Hand's home on the evening of January 15. Anthony's testimony undermined Hand's claim that Welch was an intruder who entered his home and murdered his wife. Such testimony would have contradicted Hand's self-defense theory. Thus, trial

counsel made a legitimate tactical decision to not call Anthony as a defense witness. *State v. Bradley*, 42 Ohio St.3d at 144, 538 N.E.2d 373.

{¶ 216} **3. Failure to object to Welch's statements under Evid.R. 801(D)(2)(e).** Hand argues that his counsel were deficient by failing to argue that Welch's statements to friends and family members were not admissible as statements of a co-conspirator until the prosecutor had made a prima facie case showing the existence of the conspiracy by independent proof. However, as we discussed in proposition of law I, Welch's statements were properly admissible under Evid.R. 804(B)(6). Thus, Hand suffered no prejudice.

{¶ 217} **4. Failure to object to other-acts evidence and argument.** Hand also argues that his counsel were deficient by failing to object to testimony about Hand's reaction to Jill's death, that Hand forced his father out of business, that Hand was obsessed with money, that he enjoyed reading true-crime stories, and that he was infatuated with Barbara McKinney's daughter. Further, Hand argues that his counsel were deficient by failing to object to the prosecutor's argument that his illegal business practices showed his propensity to commit the charged offenses. However, as we discussed in proposition of law II, Hand was not prejudiced by counsel's failure to object to any of this testimony or the prosecutor's argument.

{¶ 218} **5. Failure to present evidence of self-defense at evidentiary hearing.** Hand contends that his counsel were deficient in failing to present evidence of self-defense during the evidentiary hearings on the admissibility of Welch's statements under Evid.R. 804(B)(6). Hand argues that such evidence was necessary to show that Welch's unavailability was not due to Hand's misconduct.

{¶ 219} During the evidentiary hearing, Grimes testified that when Hand first discussed the murders, Hand said that he was "going to plead, self-defense." Subsequently, Hand's story changed, and he admitted to "offing them both * * * [because] anybody that messed with him would disappear." Thus, it is highly speculative whether the defense presentation of additional evidence of self-defense would have made any difference in the trial court's ruling on the admissibility of Welch's statements.

{¶ 220} Moreover, it is almost certain that Hand would have had to testify to raise the issue of self-defense during the evidentiary hearing. The record does not show whether Hand or his counsel made the decision to forgo Hand's testimony during the evidentiary hearing. However, if Hand made the decision, he has no grounds to attack his counsel's effectiveness. If it was counsel's decision, then counsel made a tactical decision that should not be second-guessed. Indeed, trial counsel could have reasonably decided not to put Hand on the stand so that the prosecutor could not cross-examine Hand and learn details of his defense. Thus, we find that trial counsel made a legitimate tactical decision in

not presenting additional evidence of self-defense during the evidentiary hearing. *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373; see, also, *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 29–32 (failure to file motion to suppress pretrial statements constituted "tactical judgment" and not ineffective assistance of counsel).

{¶ 221} **6. Failure to request jury instructions.** Hand argues that his counsel were deficient in failing to request a limiting instruction regarding "other acts" evidence and by failing to request a jury instruction defining "course of conduct." As we discussed in connection with proposition of law II, Hand was not prejudiced by his counsel's failure to request limiting instructions on "other acts" evidence. Similarly, as we discussed in proposition of law VI, Hand was not prejudiced by trial counsel's failure to submit an instruction defining "course of conduct."

{¶ 222} In conclusion, none of Hand's claims establish ineffective assistance of counsel, and we overrule proposition of law VII.

### *Penalty-phase Issues*

{¶ 223} *Ineffective assistance of counsel.* In proposition of law VIII, Hand argues that his counsel were ineffective in presenting mitigation evidence and argument through failure to (1) investigate or prepare for mitigation, (2) develop a reasonable mitigation strategy, (3) present adequate mitigating evidence, (4) object to the readmission of guilt-phase evidence, and (5) present a closing argument.

{¶ 224} **1. Failure to investigate and prepare for mitigation.** Hand contends that his counsel failed to spend sufficient time preparing for the penalty phase of the trial. Hand argues that his counsel's billing sheets show that counsel spent fewer than 30 hours preparing for mitigation, family members were not interviewed until the day before the start of the trial's penalty phase, and his counsel filed an insufficient number of pretrial motions relative to mitigation. However, we find no merit in this argument.

{¶ 225} The presentation of mitigating evidence is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. "Moreover, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 189, quoting *Wiggins v. Smith* (2003), 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471.

{¶ 226} Here, the defense employed a mitigation specialist, an investigator, and a psychologist. Each of these individuals began working on Hand's case several months before the penalty phase. The defense reviewed Hand's military records, his school records, and his medical records prior to the penalty phase. Dr. Davis,

the defense psychologist, testified that "one of the attorneys conducted extensive interviews of a variety of individuals who knew Mr. Hand and obtained background information." Thus, the record shows that the defense thoroughly prepared for the penalty phase of the trial.

{¶ 227} Hand's assertion that billing records show that his counsel spent fewer than 30 hours on mitigation appears to be based on billing records between May 30 (the date of the guilty verdict) and June 4 (the start of the mitigation hearing). Hand fails to recognize the time that his counsel, the mitigation specialist, the investigator, and his psychologist spent in preparing for mitigation before the end of the guilt-phase proceedings on May 30. Indeed, "the finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case or the numbers of days which he or she spends preparing for mitigation. Instead, this must be a case-by-case analysis." *State v. Lewis* (Fla.2002), 838 So.2d 1102, 1114, fn. 9.

{¶ 228} Hand provides no evidence supporting his claim that his attorneys did not begin interviewing his family members until the day before the penalty phase. Defense records show that several months before trial Debra Gorrell, the mitigation specialist, contacted Hand's mother, his two sisters, and his son. Even assuming that his counsel did not interview family members until the day before the penalty phase, Hand fails to show what additional information family members could have provided earlier, or how such testimony could have aided him in sentencing.

{¶ 229} We also reject Hand's argument that the lack of defense pretrial motions on mitigation shows that his counsel were ineffective. The defense filed pretrial motions to obtain Hand's childhood records with Franklin County Children Services, his military records, and his records as a Scoutmaster. Hand's counsel also filed a motion for penalty-phase instructions and proposed instructions on residual doubt. Finally, Hand fails to mention what additional motions his counsel should have submitted that would have made a difference in the outcome of his case.

{¶ 230} **2. Failure to form a reasonable trial strategy.** Hand claims that his counsel's trial strategy was ineffective by focusing on his "future value behind bars."

{¶ 231} Judicial scrutiny of counsel's performance must be highly deferential, and reviewing courts should refrain from second-guessing tactical decisions of trial counsel. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 232} The trial counsel's strategy was to convince the jury that Hand should receive a life sentence by showing that he would be a model prisoner and would have value in prison society. The trial counsel emphasized that Hand's "got intelligence; he's got mechanical ability; he loves children; [and] Bobby can

continue to be a source of support and guidance to his son, Robby, and his grandchildren." Trial counsel also pointed out that as a prisoner "[h]e will not be a predator; he will not be a source of violence with respect to other inmates; * * * he has skills; he can work in the prison auto shop; he can teach other inmates mechanical skills, and then they can leave the system with a skill * * *." Finally, the defense argued that Hand's life should be spared on the basis of mercy.

{¶ 233} In support of the defense strategy, Dr. Davis testified that Hand should do well in prison because he adjusted to the structured setting of the army, he has no prior criminal record, he has no substance-abuse problems, and he is older. Robert, his son, also testified that he would stay in contact with Hand in prison and continue to look to him for guidance. Finally, Hand said in an unsworn statement, "If allowed to live, I swear to each of you, I will be a model inmate; I will help anyone and everyone that I can help; I would devote my life to my son and his children; I will volunteer for any program to further the cause of man." The defense theory, although unsuccessful, was coherent and fit into the testimony of the witnesses. Thus, counsel made a "strategic trial decision" in presenting the defense theory of mitigation, and such decision "cannot be the basis for an ineffectiveness claim." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 190; see, also, *State v. Mason* (1998), 82 Ohio St.3d 144, 169, 694 N.E.2d 932.

{¶ 234} Hand also argues that his counsel failed to form a reasonable mitigation strategy because of his counsel's unwillingness to spend more time in presenting the defense mitigation case. Hand points to counsel's remarks during his penalty-phase opening statement.

{¶ 235} "The mitigation evidence that we're about to present to you won't be very long. We'll be done in a couple of hours. I don't want to delay this case more than it needs to be, so I've elected to tell you the things that I think you [ought] to think about now, rather than waiting until closing arguments.

{¶ 236} "* * *

{¶ 237} "Now, I've been a lawyer for 30 years. Yes, I have been involved in a number of mitigation hearings. In some of those hearings, I presented evidence how the defendant was raised; if he was abused and neglected, if drugs were involved. But I'm not going to insult you by telling you the events of Bobby's childhood led him to commit these offenses; that would be intellectually dishonest. I'm not doing that. What we will be telling you and are telling you is that imposing a death sentence on Bobby, you're going to be saying, he has nothing left to give; he has nothing of value; he's an empty box with nothing for anything."

{¶ 238} Trial counsel's comment about not delaying the case was a means of maintaining the defense's credibility and focusing the jury's attention on the mitigating factors supporting a life sentence. Indeed, the trial counsel's opening statement forcefully pointed out numerous mitigating factors that justified a life sentence. Trial counsel's remark about not relying on "the events of Bobby's childhood" was also aimed at maintaining the defense's credibility during the penalty phase. We find that counsel's decision to present this theory of mitigation represented a legitimate "tactical decision." See *State v. Hartman* (2001), 93 Ohio St.3d 274, 296, 754 N.E.2d 1150; See, also, *State v. Ballew* (1996), 76 Ohio St.3d 244, 256, 667 N.E.2d 369.

{¶ 239} **3. Failure to adequately present mitigating evidence.** Hand contends that his counsel were deficient by failing to present his mother and sister as witnesses, failing to present any witnesses from the army or evidence about his military service, failing to present any witnesses or evidence about his performance in school, and failing to present any witnesses or evidence from Franklin County Children Services. He also claims that his counsel were deficient in presenting his unsworn statement.

{¶ 240} However, "[t]he decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *Keith,* 79 Ohio St.3d at 536, 684 N.E.2d 47. Moreover, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy,* 91 Ohio St.3d at 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶ 241} Dr. Davis's testimony presented information to the jury about Hand's military, education, and Franklin County Children Services records. Dr. Davis testified that Hand's father was an alcoholic and his parents were divorced when he was a child. Franklin County Children Services removed Hand from his home, but he was later reunited with his family. Dr. Davis also testified that Hand attended five different elementary schools, but left high school to join the army. He stated that Hand served in Vietnam and received an honorable discharge from the army. Robert Hand, the defendant's son, also testified in Hand's behalf. We find that counsel's decision not to call additional family members as mitigation witnesses was a "tactical choice" and did not result in ineffective assistance of counsel. See *Ballew,* 76 Ohio St.3d at 256–257, 667 N.E.2d 369.

{¶ 242} Finally, Hand argues that his counsel were deficient in presenting his unsworn statement because Hand's plea for a life sentence focused on his ability to serve as a model inmate. However, "the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury. * * * While subject to debate,

that decision largely is a matter of style, and is a tactical decision that does not form the basis for a claim of ineffective assistance." *Brooks*, 75 Ohio St.3d at 157, 661 N.E.2d 1030. Here, Hand's unsworn statement was consistent with the defense strategy to convince the jury that Hand should receive a life sentence because he would be a model prisoner and has future value to his family and prison society. Moreover, Hand fails to indicate any additional matters he might have presented in his unsworn statement and thus failed to show that any alleged deficiencies made any difference in the outcome of the case. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 243} 4. **Failure to object to the readmission of guilt-phase evidence.** Hand argues that, with the exception of the exhibits involving the escape charge, his counsel were ineffective by failing to object to the reintroduction of all guilt-phase exhibits. Hand does not specify which exhibits he believed prejudiced him. Moreover, counsel were not ineffective by failing to object to this evidence, because the reintroduction of guilt-phase evidence is permitted by R.C. 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus; *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 157.

{¶ 244} 5. **Failure to make a closing argument.** Hand also asserts that his counsel were ineffective by failing to present a penalty-phase closing argument.

{¶ 245} During his penalty-phase opening statement, counsel informed the jury, "I've elected to tell you the things that I think you [ought] to think about now, rather than waiting until closing arguments." The trial counsel then summarized the mitigating evidence:

{¶ 246} "The evidence * * * will show you that Bobby does know how to live in orderly fashion behind prison walls: he's got intelligence; he's got mechanical ability; he loves children; that Bobby can continue to be a source of support and guidance to his son, Robby, and his grandchildren."

{¶ 247} In his opening statement, counsel also made a plea for a life sentence:

{¶ 248} "Collectively, we believe that [the penalty phase] will tell you Bobby is not a commodity, a useless commodity; he's a human being. And, although convicted of heinous crimes, we hope to show you that Bobby still can have value.

{¶ 249} "* * *

{¶ 250} "Robby * * * by losing his mother, he was a victim once and by sentencing his father to death, he would be a victim twice. * * * By a death verdict, not only are you going to be punishing Bobby, but you're going to be punishing Robby.

{¶ 251} "* * *

{¶ 252} "Bobby can conform to prison life. He will not be a predator; he will not be a source of violence with respect to other inmates; * * * He can teach other inmates mechanical skills, and then they can leave the system with a skill * * *.

{¶ 253} " * * *

{¶ 254} "I believe that if Bobby is given a life sentence, he would still be in a position to contribute to mankind.

{¶ 255} "Mr. Yost is right; I am going to be asking you to consider mercy as a mitigating factor because mercy is the dearest privilege that a person on this earth can be, is merciful. * * * I'm asking you to consider mercy and to temper justice with mercy."

{¶ 256} Here, the trial counsel's decision to present the defense case and plea for a life sentence during opening statement rather than closing argument represented a "tactical decision" that did not fall below an objective standard of reasonable representation. Moreover, waiving closing argument may have been a "tactical decision" made by the defense counsel to prevent the state from splitting closing argument and staging a strong rebuttal. See *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 47; *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242. Finally, we find that Hand has failed to prove that a reasonable probability exists that his sentence would have been different had counsel made a closing argument. See *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 257} For the foregoing reasons, we reject proposition of law VIII.

{¶ 258} *Instructions on readmitted evidence.* In proposition of law IX, Hand contends that the trial court erred by readmitting the guilt-phase evidence and then advising the jury to consider the "evidence admitted in the trial phase that is relevant to the aggravating circumstance and to any of the mitigating factors." However, the defense failed to object to these instructions and waived all but plain error. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Moreover, the defense's proposed instructions included the language that he now contends was erroneous. Thus, Hand cannot complain, because he invited the error. *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484; *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408.

{¶ 259} To the extent that the jury may have interpreted the instructions as allowing them to determine relevancy, the trial court erred. *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866. Nevertheless, much of the guilt-phase evidence was relevant to the aggravating circumstances and the mitigating factors. Further, properly admitted evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating factors. See *State v. Bryan*,

101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 208. Thus, we find no plain error and reject proposition of law IX.

### Settled Issues

{¶ 260} *Residual doubt.* In proposition of law X, Hand contends that the trial court's refusal to instruct on residual doubt as a mitigating factor violated his constitutional rights. However, we summarily reject that argument. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus; see, also, *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 160; *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 112.

{¶ 261} *Reasonable doubt.* In proposition of law XII, Hand challenges the constitutionality of the instructions on reasonable doubt during both phases of the trial. However, we have repeatedly affirmed the constitutionality of R.C. 2901.05(D). See *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163; *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916. Proposition of law XII is overruled.

{¶ 262} *Constitutionality.* In proposition of law XIII, Hand attacks the constitutionality of Ohio's death-penalty statutes. However, we also reject this claim. *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 263} Hand also argues that Ohio's death-penalty statutes violate international agreements to which the United States is a signatory. However, we have rejected similar arguments. See *State v. Bey*, 85 Ohio St.3d at 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

### Weighing the evidence

{¶ 264} In proposition of law XI, Hand argues that the death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. We shall address this argument during the independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 265} *Aggravating circumstances.* The evidence established beyond a reasonable doubt that Hand was properly convicted of a course of conduct in killing two or more people (Jill and Welch), R.C. 2929.04(A)(5), in Count One, and murder for the purpose of escaping detection, apprehension, trial or punishment for his complicity in the murders of Donna, Lori, and Jill Hand, R.C. 2929.04(A)(3), in Count Two. Under Count Two, the trial court merged the R.C.

2929.04(A)(5) specification, the three R.C. 2929.04(A)(3) specifications, and the two R.C. 2929.04(A)(8) specifications into a single R.C. 2929.04(A)(3) specification.

{¶ 266} However, Hand argues, in proposition of law XI, that we should not sentence him to death based on evidence that largely consists of Welch's hearsay statements. As we discussed in proposition I, Welch's hearsay statements were admissible under Evid.R. 804(B)(6), and thus entitled to full consideration in weighing the aggravating circumstances against the mitigating factors.

{¶ 267} *Mitigation evidence.* Hand called three mitigation witnesses, made an unsworn statement, and introduced documentary evidence for the jury's consideration.

{¶ 268} Dr. Daniel Davis, a psychologist, testified that Hand's "father was an alcoholic; there was considerable strife and potentially abuse between the husband and wife; * * * his father left the family; there was a divorce when he was a child." Because his mother was allegedly cohabiting with men in front of her children, Hand was removed from the home and "placed temporarily in * * * Franklin Village, which was a receiving center for Franklin County Children's Services. [The children] were * * * placed with an aunt and then returned back to the family."

{¶ 269} Hand attended five elementary schools and attended high school, but then left school and joined the army. Dr. Davis testified that Hand did well in the army. Hand was trained in electronics, served in Vietnam, and received an honorable discharge. Hand then trained as an auto mechanic, worked at a radiator-repair shop, and later managed his own business on the west side of Columbus.

{¶ 270} In the early 1990s, Hand was treated for multiple physical complaints and was deemed to have an anxiety disorder. Dr. Davis's testing "confirmed that he's a person that has a chronic depression and anxiety that shows itself primarily in physical symptoms."

{¶ 271} Dr. Davis testified that Hand would function well in a structured environment because Hand has no other criminal record and performed well in the army. Hand is also reasonably intelligent, possesses vocational skills, and has no history of substance-abuse problems. Moreover, "Hand has qualities that could be drawn upon in a prison setting. Even in a maximum security setting, they have community service projects that are appropriate * * *." Hand is unlikely to pose a risk as a violent inmate because of his age, lack of history of assaults, and the absence of substance-abuse problems.

{¶ 272} Frank Haberfield, past post commander and district commander of a Columbus American Legion post, testified that during the early 1990s, Hand was a Scoutmaster for a Boy Scout troop sponsored by his American Legion post.

Haberfield heard nothing bad about Hand as a Scoutmaster, and Hand seemed to care about the Scouts.

{¶ 273} Robert Hand, the defendant's son, testified that Hand is "the only close family member [he's] ever had, the only one [he's] had to look up to, and to take care of [him]." Robert's mother was Lori. However, Robert said his mother's family has "kind of pushed [him] away."

{¶ 274} Robert told the jury, "I don't want him to die. I don't. He's the only thing I have to look up [to] and * * * guide me." Robert has maintained communication with Hand since he has been in jail. Hand has told Robert to be strong and has helped guide him through the trauma of the murders. Robert said that he and his son would "most definitely" maintain contact with Hand if he were to receive a life sentence.

{¶ 275} **Hand's unsworn statement.** Hand told the jury, "I don't want to die. Like most men, I fear death. I've always wanted my life to have a purpose. * * * The state says my life has no purpose no longer * * * and that I should be killed. I don't want to be useless even in jail."

{¶ 276} Hand also said, "To kill me would end all that I am or that I could ever be, and to give me a life sentence will punish me in ways you can never imagine, but behind prison walls, I will be a man whose life is not useless. If allowed to live, I swear to each of you, I will be a model inmate; I will help anyone and everyone that I can help; I would devote my life to my son and his children; I will volunteer for any program to further the cause of man. I will do this not only for you, but for me. So that maybe in the eyes of God, I can right the wrong that I was * * * convicted of."

### Sentence evaluation

{¶ 277} We find nothing in the nature and circumstances of the offenses to be mitigating. On January 15, 2002, Hand brutally murdered Jill and Welch as part of a course of conduct. Moreover, Hand murdered Welch to eliminate the primary witness against him for Hand's complicity in murdering Donna, Lori, and Jill Hand.

{¶ 278} Although Hand's character offers nothing in mitigation, his history and background provide some mitigating features. Hand had a disruptive childhood and appears to have been raised in a dysfunctional family. Hand provided lifelong support to his son, who continues to depend on him for guidance. He also served as his son's Scoutmaster. Hand has a long work record and served honorably in the military and in Vietnam.

{¶ 279} The statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provo-

cation); (B)(3) (mental disease or defect); (B)(4) (youth of the offender; Hand was 52 at the time of the two murders); and (B)(6) (accomplice only).

{¶ 280} The R.C. 2929.04(B)(5) factor (lack of a significant criminal record) is entitled to significant weight in mitigation. The record discloses no history of criminal convictions. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 236, 690 N.E.2d 522 (absence of criminal record entitled to significant mitigating weight); *State v. Reynolds* (1998), 80 Ohio St.3d 670, 687, 687 N.E.2d 1358 (lack of substantial criminal record entitled to relatively significant weight). However, this factor is diminished by the evidence presented at trial that he may have committed two other murders, even though he escaped prosecution for them.

{¶ 281} We also give weight to mitigating factors under R.C. 2929.04(B)(7). This evidence includes Hand's long work history, his honorable military service, his work as a Scoutmaster, and Robert's testimony that Hand has been a supporting and loving father. We also give some weight to evidence that Hand will adapt well to prison. *Madrigal*, 87 Ohio St.3d at 397, 721 N.E.2d 52.

{¶ 282} Finally, we give modest weight to testimony that Hand suffers from chronic depression and anxiety as a mitigating "other factor." See *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 199 (defendant's depressive disorder entitled to some weight in mitigation). However, no evidence exists of any significant connection between Hand's mental disorders and his murders of Jill and Welch. Nor does the evidence suggest any other (B)(7) mitigating factors.

{¶ 283} We find that the aggravating circumstance under each count outweighs the mitigating factors beyond a reasonable doubt. As to Count One, Hand's course of conduct in killing Jill and Welch is a grave aggravating circumstance. As to Count Two, Hand's murder of Welch to eliminate the primary witness against him for his complicity in the murders of Donna, Lori, and Jill Hand is a very serious aggravating circumstance. In contrast, Hand offered no substantial mitigation to weigh against the aggravating circumstance in either Count One or Count Two. Thus, we find that the death penalty is appropriate.

{¶ 284} Finally, we find that the death penalty in Count One is proportionate to death sentences approved for other course-of-conduct murders. *Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 203; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 130. Furthermore, the death penalty in Count Two is appropriate when compared to death sentences approved for other murders to avoid detection, apprehension, trial, or punishment. *State v. Wilson* (1996), 74 Ohio St.3d 381, 400–401, 659 N.E.2d 292; *State v. Lawson* (1992), 64

Ohio St.3d 336, 353, 595 N.E.2d 902; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 108, 512 N.E.2d 598.

{¶ 285} Accordingly, we affirm the convictions and sentence, including the death penalty.

Judgment affirmed.

MOYER, C.J., RESNICK, PFEIFER, SINGER, O'DONNELL and LANZINGER, JJ., concur.

ARLENE SINGER, J., of the Sixth Appellate District, sitting for O'CONNOR, J.

---

David A. Yost, Delaware County Prosecuting Attorney, Marianne T. Hemmeter and Frank P. Darr, Assistant Prosecuting Attorneys, for appellee.

David H. Bodiker, State Public Defender, Stephen A. Ferrell, Pamela J. Prude–Smithers, and Wendi Dotson, Assistant State Public Defenders, for appellant.