[Cite as *State v. Woodford*, 2017-Ohio-4288.]

STATE OF OHIO, NOBLE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 16 NO 0436 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| TY E. WOODFORD, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Noble County, Ohio Case No. 216-2002

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: Atty. Kelly Riddle
Noble County Prosecutor's Office
150 Courthouse
Caldwell, Ohio 43724

For Defendant-Appellant: Atty Stephen T. Wolfe
Wolfe Law Group, LLC
1350 W. 5th Ave., Suite 124
Columbus, Ohio 43212

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: June 12, 2017

ROBB, P.J.

{¶1} Defendant-Appellant Ty E. Woodford appeals the judgment of the Noble County Common Pleas Court after a jury convicted him of complicity to illegal manufacturing of drugs in the vicinity of a juvenile and two merged offenses. Appellant challenges the sufficiency of the evidence. He also challenges the jury's weighing of the evidence. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} Due to police observations occurring in the garage at Appellant's Caldwell residence on December 10, 2015, Appellant was indicted on three drug counts. Count one charged complicity in the illegal manufacture of drugs, a first-degree felony due to the drug being methamphetamine and due to the allegation the offense was committed in the vicinity of a juvenile. *See* R.C. 2925.04(A),(C)(1),(3)(b). Count two charged Appellant with the illegal assembly or possession of chemicals for the manufacture of drugs, a second-degree felony due to the allegation the offense was committed in the vicinity of a juvenile. *See* R.C. 2925.041(A),(C). Count three charged Appellant with permitting drug abuse, a first-degree misdemeanor. *See* R.C. 2925.13(B),(C)(3).

{¶3} At trial, Deputy Myers and Deputy Stokes testified the Noble County Sheriff's Department received a report concerning a stolen vehicle at Appellant's residence. When they pulled into Appellant's driveway, Appellant was standing by his truck which was parked near a detached garage. Appellant was holding a twelve-inch long file; he explained he was using it to sharpen his chainsaw and said he was at his truck to get some tools. (Tr. 26, 28, 51). There was no garage door on the garage, which allowed the officers to see a vehicle inside. Deputy Myers testified he saw a tattered tarp partially covering a yellow 1971 Fleetside truck matching the description of the stolen vehicle. (Tr. 26, 27, 40). When the officers advised Appellant of this fact and of his rights, Appellant signed a consent form allowing the officers to search the garage. (Tr. 26, 51).

**{¶4}** Appellant said William Cool was working on the truck. (Tr. 37). At this point, William Cool walked out of the garage. He was secured in the cruiser, and the officers entered the garage. (Tr. 27). As the officers approached the truck in the garage, they noticed a strong chemical smell, which they both recognized as the smell of a methamphetamine lab. (Tr. 28, 51). Two men (Randy Rainer and Bryan Henthorne) then emerged from a room in the back left corner of the garage. The officers secured the two men and re-entered the garage. (Tr. 27). When they reached the back left corner, they observed items which appeared to be part of a methamphetamine lab. (Tr. 27-28, 52). In the lab area, they also noticed a chainsaw on a stool; it appeared someone had been working on it. (Tr. 28-29, 52). For safety reasons, the officers vacated the garage and called a special task force with expertise in neutralizing the volatile chemicals involved in making methamphetamine (aka meth). (Tr. 29-30). Thereafter, they noticed various items used in making meth were scattered throughout the garage. (Tr. 42-43).

**{¶5}** When asked if Appellant made any statements to him acknowledging the lab, Deputy Stokes responded, "He said he wouldn't know what it looked like." (Tr. 53). Deputy Myers testified that after he confronted Appellant with his observations, "[Appellant] stated that he felt there was a small shake and bake but it was not his. He said it was Mr. Cool's. * * * He said he had seen one which what he referred to as a shake and bake." (Tr. 28, 48). The officer explained the phrase "shake and bake" is the slang term for the type of meth lab involved. (Tr. 28).

**{¶6}** A lieutenant with the special task force testified he was trained to disassemble and neutralize the components of a meth lab. He confirmed the meth-making involved was called the "one pot shake and bake method." (Tr. 67). He explained the steps and supplies involved. For instance, the meth is cooked in a bottle (or reaction vessel) via a chemical reaction triggered by fluids and the lithium removed from batteries. During the violent reaction, sparks can be observed in the reaction vessel and pressure builds up during the process which must be released to avoid explosion. (Tr. 68, 110). He described how evidence of the supplies for each step was recovered from the scene. He said it takes 1-1.5 hours to make a batch of

meth. (Tr. 92). The batch recovered was not fully ready for consumption as the meth powder had not yet been extracted from the meth oil with one of the hydrogen chloride gas generators he found. (Tr. 110). He testified to lab results confirming the presence of 26.4 grams of methamphetamine in one of the reaction vessels. (Tr. 71).

{¶7} A detective testified a woman and her children were present in the house when he and the sheriff arrived that night. (Tr. 57, 60). He presented evidence the woman had two children, ages 15 and 16. (Tr. 57). He testified the house was within 100 feet of the garage, approximating it was 75 feet away. He also said one could see into the garage from the house as there was no garage door. (Tr. 58, 61). He explained there were items, including bottles with tubes coming out of them, "laying everywhere" which were observable upon entering the garage (and were not solely in the back room). (Tr. 51).

{¶8} William Cool testified he pled guilty to a drug charge arising from this incident and was serving a four-year sentence. He said Appellant was a friend he knew for many years. He had been at Appellant's house since the day before the police arrived as he was working on the stolen truck. (Tr. 118). Cool claimed he promised Appellant meth for helping him steal the truck. (Tr. 128). He disclosed he was in the garage with Appellant, Rainer, and Henthorne when the meth was being manufactured, saying they were all aware of its manufacturing. (Tr. 119).

{¶9} Cool testified Appellant went to a store and charged to his account materials for making the drug, such as muriatic acid and lye. (Tr. 120). He said they brought Rainer to Walmart to get a box of Claritin-D and everything else was already at Appellant's garage. (Tr. 119-120). As to the meth recovered by police, Cool said he would shake the bottle and then Hawthorne would shake it while Cool worked on the truck. (Tr. 121). When asked who was at the residence, Cool answered it was him, Appellant, Rainer, Hawthorne, Appellant's "old lady", and her minor children. (Tr. 121). He saw the children in the house and in the yard while he was there. He explained he did not provide the police with all of this information on the night of his arrest because he was high and he did not yet know his accomplices "told on" and "turned on" him. (Tr. 122-123, 128).

**{¶10}** The jury found Appellant guilty of the three offenses as charged. At sentencing, the state agreed the offenses merged as they were allied offenses of similar import and elected to proceed on the first-degree felony. The court sentenced Appellant to eight years in prison and imposed a $20,000 fine. Upon hearing the state's evidence regarding forfeiture specifications set forth in the indictment, the trial court refused to order forfeiture of Appellant's real property. The within appeal followed.

<u>ASSIGNMENT OF ERROR ONE: SUFFICIENCY OF THE EVIDENCE</u>

**{¶11}** Appellant's first assignment of error alleges:

"THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS."

**{¶12}** Whether the evidence is legally sufficient to sustain a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). It is a test of adequacy. *Id.* An evaluation of the credibility of witnesses is not involved in sufficiency review. *State v. Yarbrough*, 95 Ohio St.3d 227, 240, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Rather, the question is whether the evidence, *if believed*, is sufficient proof of the elements. *See id.* at ¶ 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *See Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *See State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶13}** First, Appellant argues the state failed to produce sufficient evidence he was "complicit to the manufacture or possession of the materials for assembly." Appellant points out he was only charged with offenses occurring on or about December 10, 2015 and states any suggestion of prior manufacturing cannot establish these offenses. Appellant notes the process of meth-making does not take

long and the officers did not notice a chemical smell upon his person. He points to his location (outside of the garage) when the police arrived and his consent to the search. Appellant also emphasizes how the incriminating items found in his garage (with the exception of the cooked meth) have legitimate purposes as well. Concerning Cool's testimony that Appellant charged muriatic acid and lye on his "account" at a hardware store, Appellant asks us to assume he is a contractor who uses these items for work.

{¶14} With regards to count one, R.C. 2925.04(A) provides: "No person shall * * * knowingly manufacture or otherwise engage in any part of the production of a controlled substance." With regards to count two, R.C. 2925.041(A) provides: "No person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code." Although the three offenses were merged into count one for purposes of sentencing, Appellant's arguments are not confined to the first count. He applies his sufficiency arguments to counts one and two, apparently acknowledging there is evidence from which some rational person could find he permitted Mr. Cool to commit felony drug abuse on his property under count three. *See* R.C. 2925.13(B) ("No person who is the owner * * * of premises or real estate, including vacant land, shall knowingly permit the premises or real estate, including vacant land, to be used for the commission of a felony drug abuse offense by another person.").

{¶15} Appellant was charged with complicity for count one. A person who is guilty of complicity in the commission of an offense is prosecuted and punished as if he were a principal offender. R.C. 2923.03(F). In accordance, complicity need not be charged in the indictment. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 181; R.C. 2923.03(F) ("A charge of complicity may be stated in terms of this section, or in terms of the principal offense."). The pertinent division of the complicity statute provides: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * Aid or abet another in committing the offense[.]" R.C. 2923.03(A)(2). "[T]o support a conviction for complicity by aiding

and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). This intent may be inferred from the circumstances surrounding the crime. *Id.* Circumstantial evidence and direct evidence inherently possess the same probative value, and intent is typically established by circumstantial evidence. *See, e.g., In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶16} Some of Appellant's contentions are more appropriately framed as questions regarding the weighing of the evidence, which concept is discussed in the next assignment of error. There was sufficient evidence Appellant knowingly aided or abetted in the manufacturing of the meth recovered by police and knowingly assembled or possessed one or more chemicals used to manufacture meth with the intent to manufacture meth. To review, Appellant was standing outside of his own garage by his truck when the officers arrived. He had a tool in his hand, and he advised the officers he had been sharpening his chainsaw and needed to retrieve a tool from his truck. A chainsaw was thereafter observed in the meth lab area of the garage. Three men were found in Appellant's garage, and Cool testified Appellant had been in the garage as well. Upon entering Appellant's garage, a strong chemical smell was noticeable and bottles with tubing (hydrogen chloride gas generators) could be seen in the main garage area as well in the lab area where the meth was in the process of being prepared for use.

{¶17} An expert testified meth had been manufactured as the chemical reaction had occurred and the meth oil was awaiting treatment with hydrogen chloride gas. Cool and Henthorne had been taking turns shaking the meth prior to the officers' arrival. The fact the officer did not notice a chemical smell emanating from Appellant in his driveway does not destroy the sufficiency of the evidence as to his complicity in the manufacturing of meth or his assembly or possession of chemicals with the intent to manufacture meth. The officer did not notice the smell on

Cool either, and he was found in the garage and admitted he had been shaking the meth.

**{¶18}** Cool testified Appellant provided all of the ingredients except the Claritin-D (pseudoephedrine), which Rainer bought at a store. He noted Appellant charged the muriatic acid and lye on his account at a hardware store. Other evidence recovered from Appellant's garage included drain cleaner, cut open lithium batteries, cold packs with their gel removed, coffee filters, a syringe, aluminum foil, and empty packages of pseudoephedrine. The fact the ingredients for meth-making have legitimate uses as well does not counter what a rational person could conclude upon viewing the ingredients together next to the other equipment and vessels, one of which actually contained meth. Cool said he promised to give Appellant meth in exchange for his help with the stolen truck. Furthermore, an officer testified Appellant acknowledged Cool had a "small shake and bake" in the garage.

**{¶19}** Besides finding Appellant allowed the manufacturing to occur in his garage and assembled various items therein, a rational person viewing the evidence in the light most favorable to the state could find he knowingly assembled or possessed one or more chemicals that can be used to manufacture meth with the intent to manufacture meth and assisted, supported, and encouraged the actual manufacturing of meth by providing multiple ingredients, the equipment, and the location/building.

**{¶20}** Next, Appellant argues the state did not present sufficient evidence to prove counts one and two were committed in the vicinity of a juvenile, which was an additional element used to elevate the degree of those offenses. *See* R.C. 2925.04(C)(3)(b); R.C. 2925.041(C).

> An offense is "committed in the vicinity of a juvenile" if the offender commits the offense within one hundred feet of a juvenile or within the view of a juvenile, regardless of whether the offender knows the age of the juvenile, whether the offender knows the offense is being committed within one hundred feet of or within view of the juvenile, or whether the juvenile actually views the commission of the offense.

R.C. 2925.01(BB).

{¶21} Appellant states the distance of the house from the garage was not accurately established and suggests the distance from the house should be calculated from the exact spot in the garage where the manufacture occurred, not merely from the garage itself. As to the alternative component to this element, which asks whether the offense was committed within the view of a juvenile, Appellant states there was no evidence the back room where the lab was located would have been visible from the house. Appellant also points out it was dark outside when officers arrived and there were no lights on in the garage.

{¶22} Appellant's girlfriend answered the door when the sheriff and the detective-captain arrived at the house while awaiting the task force. She disclosed her children were upstairs sleeping, and she went up to check on them. (Tr. 60). The detective presented evidence this woman's two children were 15 and 16 years old. Appellant complains the police failed to verify these children were upstairs. However, this is not a question of sufficiency; any unobjected to issue regarding the detective testifying to what the mother told him about her children would have involved a hearsay argument. Moreover, when the state asked who else was there at the residence, Cool testified: "Me, Ty, Randy Rainer, Bryan Henthorne, Ty's old lady, [name omitted] and the kids." He explained these were the children of Appellant's girlfriend and they were under 18. While he was there, he saw the children (in house and in the yard) but not in the garage. (Tr. 121). This was additional confirmation of the children's presence at the house. Appellant construes Cool's testimony on this subject as referring to a different meth-making day because Cool previously said it would not surprise him if gas generator bottles were found (even though the meth had not yet been subjected to this stage) because these items were used two to three weeks earlier. (Tr. 121). However, read in context, Appellant's construction of Cool's testimony is not mandated. Cool had also just been asked how many batches he made on the day police arrived to which he responded, "That was the only one that day." (Tr. 120). He also noted he would have made more that day if he had more Claritin-D. (Tr. 122).

{¶23} As to location, Cool testified he was working on the stolen truck when the police cruiser pulled in the driveway. (Tr. 130). Appellant told police he was sharpening his chainsaw, and Cool acknowledged the light was on when the police pulled in (at which point they turned off the light and he, Rainer, and Henthorne hid, while Appellant ran outside). (Tr. 129). The truck was not in the back room of the garage. It was visible from outside of the garage which had no garage doors. Although many of the incriminating items were found in the back lab area, meth-making items including bottles with hoses (gas generators) were visible in the main garage area. (Tr. 43, 61, 70). Some meth-making items were found outside of the garage as well, including muriatic acid. (Tr. 72). There was direct evidence the possession or assembly of chemicals used to make meth did not occur merely in the back room of the garage. Additionally, it can be reasonably inferred the manufacture of meth did not occur solely in the back room of the garage. The reaction vessel was very portable, and Cool said he took turns shaking the meth mixture with Henthorne, who would take over while he worked on the truck. (Tr. 121). He also suggested they proceeded to the back room upon the arrival of the police.

{¶24} Encompassed within the statutory definition of "vicinity of a juvenile" is the legislative "intention is to proscribe transactions in locations where juveniles could view the activity." *State v. Riel*, 4th Dist. No. 08CA3, 2008-Ohio-5354, ¶ 8. The detective testified the garage was in view of the house and he could see into the doorless garage from the house. (Tr. 58). Alternatively, the detective testified the house was within 100 feet of the garage. When asked to specify the distance, he answered, "75 feet I would guess." (Tr. 58). Photographs were introduced as evidence. As the state points out, there was also a jury view of the scene.

{¶25} Viewed in the light most favorable to the prosecution, there was sufficient evidence juveniles were present in the house with their mother and there was sufficient evidence the garage was within 100 feet of the house and/or the interior of the garage was within the view of people in the house (and any person in the yard and driveway). As aforementioned, the statute defining "vicinity of a juvenile" specifically provides it is irrelevant "whether the juvenile actually views the

commission of the offense." R.C. 2925.01(BB). This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO: WEIGHT OF THE EVIDENCE

**{¶26}** Appellant's second assignment of error provides:

"THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶27}** Even if a trial court's judgment is sustained by sufficient evidence, a defendant can argue the judgment is against the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Id.* It is not a question of mathematics but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion, whereas sufficiency involves the burden of production. *Id.* at 390 (Cook, J., concurring). The appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

**{¶28}** This discretionary power of the appellate court is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* In fact, where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution. The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389.

**{¶29}** In other words, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio

St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact occupies the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶30} Appellant generally asks us to review the weight of the evidence establishing his complicity and whether counts one and two took place in the vicinity of a juvenile. In addition, Appellant sets forth two specific arguments concerning the credibility of certain testimony. First, Appellant criticizes the testimony of Deputy Myers used to assist in establishing his knowledge of the meth manufacturing occurring in his garage. Deputy Myers testified that after they confronted Appellant with their observations: "He stated that he felt there was a small shake and bake but it was not his. He said it was Mr. Cool's. * * * He said he had seen one which what he referred to as a shake and bake." (Tr. 28, 48). (Tr. 28). Appellant emphasizes how Deputy Myers did not put this statement in his report and points to the testimony of Deputy Stokes that Appellant "said he wouldn't know what it looked like." (Tr. 53).

{¶31} The state points out it is not uncommon for a defendant in such situations to give conflicting statements at different times in the investigation and/or to different officers. We note there is no testimony by Deputy Myers that Deputy Stokes would have heard the statement attributed to Appellant as an acknowledgement of Cool's operation. As outlined supra, other evidence confirmed the conclusion Appellant knew meth was being made in his garage, knowingly permitted meth to be made in his garage at the time in question, assembled one or more chemicals with intent to make meth, and was complicit in the manufacture of meth. The fact Appellant gave consent to search after the officers advised him they knew the truck in plain view was stolen does not require one to conclude he did not know meth was

being made. One could conclude Appellant imagined the officers would merely approach the truck to confirm the serial number, call a tow truck, and arrest him or Cool for the theft or receipt of the vehicle.

{¶32} Next, Appellant attacks the credibility of Cool. He states Cool testified out of vengeance as Cool said he did not want to be the only one who went to prison and he decided to incriminate Appellant after learning he and the others incriminated him. (Tr. 122-123, 128). Appellant notes Cool attempted to deflect the question as to whether he received any benefit in return for his testimony. (Tr. 123). Cool explained he already pled to the illegal manufacturing and receiving stolen property offenses involved in this case and was sentenced to four years in prison. He denied the state decided not to pursue other charges as a result of his cooperation, stating any other charges were not pursued due to a lack of evidence. (Tr. 124). The jury was presented with Cool's felony convictions and motivations. They were provided the accomplice instruction twice, advising for instance: Cool's complicity may affect his credibility; his testimony may be subject to grave suspicion; and his claims should be weighed with great caution. (Tr. 117, 16).

{¶33} The jury heard and saw each witness testify on direct and on cross-examination. The jury was able to evaluate any behavioral pauses or verbal/non-verbal disconnects during questioning. As to each witness, the jury viewed the demeanor, gestures, voice inflections, and eye movements, all of which could tend to project an aura of truthfulness or untruthfulness as the case may be. It was within the province of the jurors to find Cool's story credible, just as they could choose to believe the officer's testimony about Appellant acknowledging he knew of Cool's meth-making in his garage.

{¶34} As aforementioned, in evaluating a weight of the evidence argument, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Lang*, 129 Ohio St.3d 512 at ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. Upon such review, this

is not an exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice. We refuse to sit as the thirteenth juror in this case. This assignment of error is overruled.

{¶35} For the foregoing reasons, the trial court's judgment is affirmed.


Donofrio, J., concurs.

DeGenaro, J., concurs.